---

(No. 13246.—Judgment affirmed.)
THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* LAWRENCE CIONE, Plaintiff in Error.

*Opinion filed June 16, 1920.*

1. CRIMINAL LAW—*what does not constitute one a principal in an assault.* Mere presence during the commission of an assault is not sufficient to constitute a party a principal unless there is something in his conduct showing a design to encourage, incite or in some manner aid or abet or assist the assault, and it is not sufficient that there is a mere negative acquiescence not in any way made known to the principal malefactor.

2. SAME—*when jury may consider negative conduct of spectator in connection with other circumstances.* If the proof shows that a person is present at the commission of a crime without disapproving or opposing it, the jury may consider this conduct, in connection with other circumstances, in reaching the conclusion that he assented to the commission of the crime, lent to it his countenance and approval and was thereby aiding and abetting the same.

3. SAME—*evidence otherwise admissible is not incompetent because it discloses other offenses.* The test of admissibility of evidence is the connection of the facts proved with the crime charged, and whatever testimony tends directly to show the defendant guilty of the crime charged is competent although it tends to show him guilty of another offense.

293 — 21

4. SAME—*when evidence of subsequent robbery is admissible in murder trial.* Where a defendant in a murder trial testifies that he participated in a murder because he was afraid of his accomplice, his subsequent conduct in assisting his accomplice in binding the wife of the victim and robbing his house is admissible to rebut such defense, and also his earlier testimony that the assault upon the deceased was not made with any previous understanding to rob.

5. SAME—*evidence of subsequent acts is competent to prove participation in assault.* While it is generally true that proof tending to show one to be an accessory before the fact in a murder case would be of events occurring before the inflicting of the fatal blow, yet evidence of his subsequent acts is competent to prove his participation in the assault.

6. SAME—*when the person assisting the principal malefactor is guilty of murder.* Even though blows sufficient to cause death within a brief time have already been inflicted by the principal malefactor, yet if his companion thereafter inflicts another wound or does some act in disposing of the victim which hastens death the companion is guilty of murder though he did not actively participate in the original assault.

7. SAME—*when an alleged error is waived.* An alleged error which is not among the grounds specified in the written motion for a new trial which was filed in the case is waived.

WRIT OF ERROR to the Circuit Court of Macon county; the Hon. WILLIAM K. WHITFIELD, Judge, presiding.

MILES J. DEVINE, and THOMAS W. SAMUELS, for plaintiff in error.

EDWARD J. BRUNDAGE, Attorney General, LOUIS A. BUSCH, State's Attorney, and EDWARD C. FITCH, for the People.

Mr. JUSTICE THOMPSON delivered the opinion of the court:

Plaintiff in error, Lawrence Cione, and Joseph Ptak, were indicted at the April term of the Champaign county circuit court for the murder of Edward Nofftz. The first count of the indictment charges that the murder was committed in some way and manner and by some violent means

unknown. The second and third counts charge that the murder was committed by striking deceased upon the head with an iron pipe. The fourth and fifth counts charge that the murder was committed by striking deceased upon the head with a hammer and a pipe. The sixth count charges that the murder was committed by knocking deceased unconscious and then burying him in a bin of chopped feed, thereby smothering and choking him to death. The seventh count charges that the murder was committed by knocking deceased unconscious and then strangling him to death by placing a strap tightly about his neck. Separate trials were granted. Ptak was convicted of the murder and sentenced to life imprisonment. The plaintiff in error was granted a change of venue to Macon county, where he was convicted of the crime of murder and sentenced to life imprisonment. This writ of error is prosecuted to review the judgment of conviction of plaintiff in error.

It is first contended that the common law record fails to show affirmatively that plaintiff in error was present on the last day of the trial, when the evidence was concluded, the instructions given to the jury and the verdict returned into court. It is also contended that it does not affirmatively appear that the officers in charge of the jury were sworn nor that the court was legally constituted. On motion the record was amended by the circuit court of Macon county to show the facts, and the record as amended has been filed in this court. We have examined the record as amended and find it sufficient.

Edward Nofftz and his wife lived on a 300-acre farm near Pesotum, in the southern part of Champaign county. March 23, 1919, Ptak and plaintiff in error reported to Nofftz, saying they had been sent by a government employment agency at Chicago. They were employed and worked Monday and Tuesday. Wednesday morning, March 26, it began to rain, and as no work could be done in the field deceased prepared to oil his harness. According to the tes-

timony of Mrs. Nofftz, plaintiff in error and Ptak carried
a tank from a hog lot to the barn. Shortly before that de-
ceased left the house to go to the barn to make arrangements
for oiling the harness. At eight o'clock plaintiff in error
and Ptak came into the kitchen and went to the sink to
wash their hands. Mrs. Nofftz was standing at the kitchen
table, making cookies. She noticed that their clothing was
damp and that their trousers were covered with ground
feed. A *Ladies' Home Journal* was lying on the table near
her, and plaintiff in error inquired if that magazine con-
tained funny stories. He also inquired how long it would
take her to bake the cookies, and she replied, "About fifteen
minutes." He said his sister baked hers in about twenty
minutes. Then he went to his bed-room. When he re-
turned he talked about different things until Mrs. Nofftz
went to the sink to wash her hands. While she was there
Ptak hit her on the back of the neck and plaintiff in error
got a dining room chair and tied her to it with straps. The
plaintiff in error said to her, "We want money." Ptak said,
"Ed can't help you; he is in the same condition in the
barn as you are in the house, only he is bound to a wagon."
They took her to their bed-room and left her sitting there.
Then the house was searched by them and they took what
jewelry and money they could find. About nine o'clock Ptak
left the house and tried to start the automobile, but it would
not start. While he was gone plaintiff in error stood guard
over Mrs. Nofftz with a rifle. When Ptak returned to the
house he stood guard and plaintiff in error tried to start
the car. While they were searching the house they found
a check book, and Ptak suggested having Mrs. Nofftz sign
a check for a large amount. Plaintiff in error said that
would be too risky, because the check would not be good
unless they took it to the barn to have deceased sign it,
so Ptak gave up the idea and threw the check book down.
Plaintiff in error asked Mrs. Nofftz if there was any par-
ticular piece of jewelry she wanted, and she asked for her

mother's wedding ring and her diamond engagement ring. He replied that he had always told Joe not to take wedding rings because names were engraved on them. They gave back the wedding ring but did not return the diamond ring. About one o'clock they threw Mrs. Nofftz on the bed with her hands tied behind her and covered her up with spreads and quilts, after which they left the house. They carried the stolen property away in grips found in the house. They could not get the car started, so they shot a hole in the gasoline tank to prevent its being used to follow them and then drove away with a team and buggy belonging to deceased. After Mrs. Nofftz got her arms released she went to the north end of the barn. She found a gas pipe, a bloody hammer, deceased's hat turned up-side down, a heap of harness and a bloody handkerchief. There was a little patch of blood near where the harness had been dipped, close to where the hat was found. She did not find the body of Nofftz.

Joseph Ptak was called by the court. Upon direct examination by the court he testified that he was seventeen years of age; that he had known plaintiff in error about seven years; that they came from Chicago and went to the Nofftz farm and told Nofftz that they were sent there by the government employment agency; that Nofftz said he would try them out; that they worked about the farm Monday and Tuesday and on Wednesday morning were told to get ready to oil the harness; that they had carried out about eight sets of harness when he asked deceased to give them enough money to get back to Chicago; that deceased said they had not been working long enough to pay for their meals and refused to give them the money; that he lost his temper and picked up a piece of gas pipe about two and a half feet long and about one and a half inches in diameter and hit deceased on the head; that plaintiff in error was then standing in front of deceased; that at the time he hit deceased the latter was driving a stake into the ground;

that deceased was bent over when he picked up the pipe and hit him on the head; that when deceased fell over he told plaintiff in error to get a horse blanket and some straps; that he got them and they wrapped deceased in the blanket and put the straps around him; that the blanket was put all over his head, face and body; that deceased was still groaning and he picked up the hammer and hit him on the head; that the plaintiff in error did not strike deceased but helped wrap him in the blanket and helped to carry him into the barn; that they threw deceased into the ground-feed bin head first, threw his feet over into the bin and then covered him up with feed; that the plaintiff in error got some hundred-pound sacks of feed and threw them on top of deceased; that plaintiff in error only did what he told him to do and that they had had no previous understanding about what they would do; that they had had no understanding about killing deceased or about robbing him or burglarizing his house; that they went to the house and Mrs. Nofftz told them to brush the ground feed from their clothes; that Mrs. Nofftz was baking cookies when they went in the house, and when she went to the sink to wash her hands he struck her and told plaintiff in error to tie her hands; that they placed her on a chair and asked her for money and that she told them she did not have any; that they searched the house and found some money, some rings and watches; that they untied Mrs. Nofftz from the chair and allowed her to walk around the house with her hands tied behind her; that after he had rifled the house he went to start the car and spent thirty or forty minutes with it; that after that plaintiff in error tried to start it but couldn't; that they put Mrs. Nofftz on the bed, covered her up and took a team of horses and drove away; that they were captured about nine miles beyond Pesotum. On cross-examination by the State's attorney he testified that plaintiff in error was in front of deceased when he hit him and that plaintiff in error did nothing until he told him to go and

get the blanket. He admitted that when he was testifying
in his own defense in the circuit court of Champaign county
he said he struck deceased once and that he did not know
how many times plaintiff in error struck him, but that it
was about two or three times. He further testified that at
the time deceased was thrown into the granary he was kick-
ing, and that he continued to kick until after the time he
was buried in the ground feed, and that he was still kick-
ing when they threw the grain sacks on top of him; that
they buried him in the ground feed about a foot; that plain-
tiff in error did not put any feed over deceased. He ad-
mitted that on his former trial he had testified that plaintiff
in error was the one who buried deceased in the feed while
he stood outside the granary. He also admitted that just
before he was called to the stand in the present trial he told
assistant State's attorney Roph that plaintiff in error hit
deceased over the head several times after he hit him. He
also told Roph that he and plaintiff in error had agreed to
get rid of deceased and get whatever money was on the
premises. He admitted that he told Roph, before going on
the stand, that plaintiff in error had said to him, "What is
the use of working from morning to night when we can
get money easier than we are now getting it? You hit
the farmer on the head and I will tie him up good and
then we will go to the house and grab the missus and get
the property that is in the house," but on the stand he de-
nied that any such conversation was ever had between him
and plaintiff in error. He testified further that when plain-
tiff in error tied Mrs. Nofftz's hands he tied her with some-
thing that he took out of his pocket. He admitted writing
a letter to his mother shortly after the commission of the
crime in which he discussed the crime and implicated plain-
tiff in error. He testified that it was about a minute and
a half after they struck deceased until they carried him into
the granary; that he did not know whether deceased was
breathing at the time they wrapped him in the blanket but

that he was kicking. He also admitted that while the sheriff was bringing him from Champaign to Decatur to testify he made the statement that he had gotten all he could get and that there was no use in plaintiff in error going down for the same thing. On cross-examination by the attorney for plaintiff in error he testified that when they carried the body into the granary he did not know whether deceased was dead or alive but that he was kicking; that when he struck him he hit him hard; that the description of the killing found in the letter to his mother was not true; that he was angry when he wrote the letter and implicated plaintiff in error because plaintiff in error was giving interviews to the newspapers, saying he was a good boy and never did anything wrong.

Plaintiff in error testified that he was seventeen years of age; that on the morning of March 26, when they were oiling the harness at the barn, Ptak asked deceased for his money, and deceased told them to work a while longer and then he would pay them; that Ptak argued with him a while and then stood leaning against the barn door, saying nothing; that he gathered up some stakes and sharpened some of them with an ax, and that while deceased was driving one of the stakes Ptak picked up a piece of pipe and struck deceased on the back of the head; that witness ran into the barn and Ptak hollered to him to bring out a blanket, and that he was afraid to refuse and brought it out; that Ptak rolled deceased on the blanket and that they wrapped him up and tied him; that he saw Ptak strike deceased only once and that he did not strike him at all; that he did not know Ptak was going to strike deceased until he saw the pipe coming down; that after they put deceased in the granary Ptak told him that he should grab Mrs. Nofftz and that he told him he would; that when he got to the house he refused to grab her, so Ptak did it and made him tie her hands; that he used a leather string which he had taken from the harness; that Ptak then told him

to go through the house and get all that he could; that he
claimed he could find nothing, and that Ptak then went
through the house and found money, watches and jewelry;
that they found the guns in the house and loaded them and
he stood watch over Mrs. Nofftz; that he got two suit-
cases from one of the rooms and that they packed the stuff
in them; that Mrs. Nofftz asked him for her engagement
ring, a marriage ring and a ten-dollar gold piece; that he
looked in the grip he had but could find nothing but the
marriage ring and a two-dollar-and-a-half gold piece; that
he gave her these while Ptak was out of the house trying
to start the car. On cross-examination by the State's at-
torney he testified that when he went to get the blanket
he found it on the wagon, just inside the driveway; that
at the time he went for the blanket he was out of sight
of Ptak probably half a minute; that he helped tie deceased
because he was told to; that when he was called to bring
the blanket he was running away from the scene; that just
before deceased was rolled onto the blanket he was saying
something; that he was not kicking at all when he strapped
his legs; that he got the grain sacks because Ptak told him
to; that he did not see deceased kicking and moving when
the sacks were thrown on his legs; that he did not see Ptak
hit deceased any time after the blanket was put over his
head; that he did not see Ptak hit deceased with a ham-
mer and that he did not hit him with a hammer; that Ptak
took a horse and rode a quarter of a mile to the field to
get some gasoline for the automobile while he stayed and
guarded Mrs. Nofftz; that he was not afraid of Ptak then
but that he did not turn Mrs. Nofftz loose; that it was
Ptak who demanded the money from Mrs. Nofftz and not
he; that he shot a hole through the gasoline tank of the
automobile so that nobody could follow them; that Ptak
did not make him do that. In answer to questions by the
court he testified that after deceased was struck, and while
he was on his hands and knees, he hollered, "Help! boys!"

that he was in that position when he placed the blanket beside him and that Ptak pushed him over on the blanket; that when Ptak pushed him over on the blanket he stretched out; that just before he was pushed on the blanket he was in the position of a man trying to get up. Plaintiff in error admitted that Ptak is smaller than he is.

Dr. Bundy testified that he saw the body of deceased about two o'clock in the afternoon; that deceased was dead at that time; that there were fractures on his head; that he found nine distinct wounds in the back and on the top of the head; that none of them appeared to have any relation to the others; that eight were more or less clean-cut and one was a bruise; that the bruise ran crosswise from the top to the back of the head and was about two and a quarter inches in length; that the clean-cut wounds were from a half inch to two inches in length; that the wounds appeared to be such as would be made by the claw-hammer produced in evidence; that the tongue of the deceased protruded from the mouth a little, with some discoloration of the face and neck; that this discoloration could be the result of the blows on the head, since such blows would affect the nerve supply of the organs of respiration and cause a paralysis of the muscles, or the discoloration and the protruding of the tongue could be the result of death by suffocation; that the wounds on the head were sufficient to produce death; that if deceased was buried in the ground feed approximately one foot, that would produce suffocation if he were still alive at the time he was buried. It was the further opinion of the physician that the wrapping of deceased in a blanket and burying him in the ground feed after receiving the wounds would have hastened his death if he were still alive when wrapped in the blanket. It was his opinion that deceased lived from three to five minutes after receiving his wounds.

Counsel for plaintiff in error earnestly contend that he cannot be guilty of murder because there is no proof in

the record that he struck deceased or that he gave any aid
or assistance to Ptak in the assault. They contend that the
testimony of the physician shows that the blow with the
gas pipe was the cause of death and that plaintiff in error
had no knowledge of the intention of Ptak to strike this
blow, and that he had not previously advised or encouraged
Ptak to make the assault. It is true that the mere pres-
ence of plaintiff in error is not sufficient to constitute him
a principal unless there is something in his conduct show-
ing a design to encourage, incite or in some manner aid or
abet or assist the assault. Aiding, abetting or assisting are
affirmative in their character. It is not sufficient that there
is a mere negative acquiescence not in any way made
known to the principal malefactor. (*White* v. *People,* 139
Ill. 143; *Crosby* v. *People,* 189 id. 298.) Of course, an
innocent spectator is not criminally responsible because he
happens to see another commit a crime, but if the proof
shows that a person is present at the commission of a crime
without disapproving or opposing it, it is competent for the
jury to consider this conduct in connection with other cir-
cumstances and thereby reach the conclusion that he assented
to the commission of the crime, lent to it his countenance
and approval and was thereby aiding and abetting the same.
(*People* v. *Marx,* 291 Ill. 40.) The evidence here clearly
shows that plaintiff in error immediately acquiesced in the
assault made on the deceased; that he immediately got the
blanket and assisted Ptak to wrap and tie deceased in the
blanket while deceased was still alive; that many of the
wounds were inflicted on the head of deceased after plain-
tiff in error actively participated in rendering deceased help-
less; that deceased was buried in the ground feed while he
was still kicking, and that plaintiff in error assisted in plac-
ing three hundred-pound sacks of feed over the body of de-
ceased, thereby preventing deceased from extricating him-
self even if he had sufficient vitality left to regain conscious-
ness. While the doctor testified that the wounds on the

head were sufficient to cause death within from three to five minutes, it would not relieve plaintiff in error from responsibility for the death if he inflicted some other wound or did some other act which would hasten the death. Conceding the contention of plaintiff in error that the proof does not show that he had a previous understanding with Ptak, we think the evidence clearly justified the jury in finding that plaintiff in error contributed to the death of deceased.

It is further contended that the court erred in admitting proof of the assault on Mrs. Nofftz and the larceny of the property of deceased. The general rule is that evidence of a distinct substantive offense cannot be admitted in support of another offense, but if evidence is admissible on other general grounds it is no objection to its admission that it discloses other offenses. The test of admissibility of evidence is the connection of the facts proved with the crime charged, and whatever testimony tends directly to show the defendant guilty of the crime charged is competent although it tends to show him guilty of another offense. The party cannot by multiplying his crimes diminish the volume of competent testimony against him. (*Williams* v. *People,* 166 Ill. 132; *People* v. *Jennings,* 252 id. 534; *People* v. *Moeller,* 260 id. 375.) It will be remembered that plaintiff in error contends that the assault was not made with any previous understanding to rob, and he also contends that what he did after Ptak made the assault was at the direction of Ptak and because of his fear of Ptak. The evidence of his subsequent acts was clearly admissible to rebut these special defenses. (Wharton on Crim. Evidence,—10th ed.—sec. 41; *Hopps* v. *People,* 31 Ill. 385.) In *People* v. *Molineux,* 168 N. Y. 264, 61 N. E. 286, many of the exceptions to the rule that proof of collateral offenses is not admissible are discussed at considerable length. The opinion was considered of sufficient importance to justify the author of Wharton's Criminal Evidence printing it in

full as a foot-note to section 31 of the tenth edition. It was there held that evidence of other crimes is generally competent to prove the specific crime charged when it tends to establish motive, intent, absence of mistake or accident; a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the others or the identity of the person charged with the commission of the crime on trial. While it is generally true that the proof tending to show one to be an accessory before the fact would be of events occurring before the inflicting of the fatal blow, yet evidence of subsequent acts is competent to prove participation in the criminal assault. (Wharton on Homicide,—3d ed.— sec. 49.) In *People* v. *Wood,* 3 Park. Crim. 681, the defendant was charged with the murder of his brother's wife. The brother, his wife and two children were poisoned with arsenic. The brother and his wife died but the attempt upon the lives of the children failed. Thereupon the defendant procured himself to be appointed the guardian of his brother's children and then commenced to create and utter various false and forged claims against his brother's estate. The theory of the prosecution was that the defendant coveted his brother's estate, and in order to gain possession of it conceived the plan to murder those who stood in his way; that failing in the attempt to kill the children he attempted to accomplish his object by forgery. It will be seen that the forgeries were committed some time subsequent to the murder and that the forgeries were wholly disconnected with the murder, and yet it was held that evidence of all the crimes involved was properly received on the theory that it tended to prove the motive for the commission of the crime charged. The evidence of the events occurring at the house subsequent to the assault upon deceased was clearly admissible, not only because it tended to show that the murder was committed pursuant to a prearranged plan to rob deceased, but because it clearly showed

that the participation of plaintiff in error was free and voluntary and not through fear of Ptak. The court should not have admitted evidence of all the details of the robbery, (*People* v. *King,* 276 Ill. 138,) but these details were so unimportant in comparison with the details of this brutal and wanton assault that they could not possibly have influenced the jury in reaching their verdict.

It is further contended that the trial court erred in interrogating the witness Ptak and the plaintiff in error. We have examined the questions put to the witnesses by the trial judge, and think that the questions were proper and did not prejudice the rights of plaintiff in error. Furthermore, this question was not raised by plaintiff in error in his written motion for a new trial and therefore must be considered to have been waived. *Call* v. *People,* 201 Ill. 499; *Herder* v. *People,* 209 id. 50; *Yarber* v. *Chicago and Alton Railway Co.* 235 id. 589.

It is further contended that the trial court erred in giving certain instructions offered by the People and in refusing certain instructions offered by plaintiff in error. We have examined the series of instructions and consider the objections hypercritical. We think the instructions, taken as a series, fully advised the jury of all the law applicable to the case.

The guilt of plaintiff in error was clearly and overwhelmingly established by the evidence and the record fully justifies the maximum penalty of the law. Plaintiff in error may consider himself fortunate that he was tried by a jury that gave him the benefit of punishment by imprisonment. Any other verdict than one of guilty would have been wholly unwarranted, and the penalty is as light as plaintiff in error could reasonably expect.

The judgment of the circuit court is affirmed.

*Judgment affirmed.*