R. KEELIKOLANI *vs.* D. MANAKU.

ON APPEAL.

A DOCUMENT IN HAWAIIAN placing defendant in charge of a tract of land as a "kahu" or superintendent, perpetually, from the 15th day of December, 1874, reciting that the defendant was to be continued as "kahu" in the same attitude and office as his predecessor and uncle had sustained to the ancestor of the plaintiff, and that if defendant died before plaintiff, then the land would revert to plaintiff and her heirs;

HELD, that no life estate was created in defendant, but that he was appointed plaintiff's agent of this land with the obligation to account for rents and profits.

Opinion of the Court by McCULLY, J.

The answer admits that defendant has set up an exclusive life estate in the land of Moanalua, subject to a charge or rent styled "Auhau ku i ka wa," and to a right of the plaintiff to reside on the land whenever she may wish. His claims are founded on the instrument of which we here give the original Hawaiian and the translation which we adopt as giving the literal and true meaning in the English language:

[THE DOCUMENT.]

E ike auanei na mea a pau ma keia, owau, o Luka Keelikolani ka hooilina hookahi i koe o na waiwai a pau o Kamehameha V i make, mamuli o ko'u pono, a i kulike ai no hoi me ke ano o ka noho ana a ko maua kahu i aloha nui ia, oia o Kaleiluhiole, i make, ma ka aina o Moanalua, Mokupuni o Oahu, ma ka haawi ana aku a ko'u kaikunane Kamehameha

V i make, a i hoomau ia aku no hoi e a'u i ko maua kahu ia Kaleiluhiole mahope iho o ka make ana aku o ko'u kaikunane o Kamehameha V; nolaila, i kulike ai me ke ano o ia noho ana o ko'u kaikunane Kamehameha V me kona kahu me Kaleilu- hiole, ke hookohu a hoomau aku nei au ia pono a kuleana a pau maluna o ko'u kahu, ke keiki a Kaleiluhiole, oia hoi o David Manaku, a mau loa, mai keia la 15 o Dekemaba, 1874, i ua aina la o Moanalua, mai ka uka a ke kai; aka hoi, ina e make e aku kuu kahu o David Manaku mamua o'u, alaila, e hoi mai no ka aina o Moanalua me a'u, a me ko'u mau hooilina.

A ma keia no hoi, e like me na pono i hookoe ia mai e ko'u kaikunane Kamehameha V, ma ua aina la, oia hoi, na auhau ku i ka wa a'u e makemake ai a me ko'u noho ana maluna o ua aina la o Moanalua, i na wa a pau a'u e makemake ai, pela no hoi au e hookoe nei ia'u a me ko'u mau hooilina e like me ia i hahaiia ae la.

No ka oiaio o keia ke kakau nei au i ko'u inoa ma keia la 1 o Feberuari, makahiki 1875.          R. KEELIKOLANI.

[TRANSLATION.]

Know all men henceforth by these presents that I, Ruth Keelikolani, the only heir of all the property of Kamehameha V, deceased, in consequence of my right and in accordance with the manner in which our beloved Kahu (care-taker) Kaleiluhiole, deceased, lived upon the land of Moanalua, Island of Oahu, through the appointment of my brother Kame- hameha V, deceased, which appointment I continued to our Kahu Kaleiluhiole after the decease of my brother Kame- hameha V; therefore, in accordance with (just like) the man- ner of living of my brother Kamehameha V with his Kahu, Kaleiluhiole, I myself now appoint and continue all the said rights and privileges to my Kahu (superintendent or care- taker), the child or nephew of Kaleiluhiole, David Manaku, perpetually, from and after the 15th day of December, 1874, upon the land of Moanalua from the mountain to the sea; but indeed, if my Kahu (superintendent) shall die before I do,

then the land of Moanalua shall return to me and my heirs; and further, in accordance with the rights reserved over that land by my brother Kamehameha V, that is to say, whatsoever I shall from time to time require, and my right of occupying that land at all times whenever I please, which I reserve to myself and my heirs as above set forth.

For the truth of this I have hereunto set my name this 1st day of February, A. D. 1875.

(Signed) R. KEELIKOLANI.

It will be remarked at once that the instrument is essentially native Hawaiian in its character, although having a resemblance in phraseology and form to a common deed or lease. It would be difficult, and perhaps not possible, to give a reasonable interpretation and one which would reconcile every part to the whole without taking the point of view from the mind of the native Hawaiian. And we deem it right to do this on the principle of construction that contracts are to be interpreted according to the intention of the parties, as they have expressed them, and because the recitations of the instrument require us to consider the peculiar Hawaiian relation subsisting between the grantor and grantee in this instrument and between the predecessors of both of them. Furthermore, counsel on both parts have assumed that this must be the mode of interpretation, and have offered testimony and made argument upon the nature of the Hawaiian relation of the parties. We do not by this support the idea that a contract made between Hawaiians, or to which a Hawaiian is one party, is free from the application of the settled principles of interpretation as known in Courts.

The first and controlling inference to be drawn from the instrument is that the plaintiff placed the defendant on her land of Moanalua in the same attitude and office as that held by one Kaleiluhiole towards the late Kamehameha V, and subsequently toward his heir, until 1874, when Kaleiluhiole died.

34

The recital is that the beloved kahu of the deceased brother of the plaintiff had lived on the estate in question, and had been continued there by the plaintiff after her brother's death till his own decease, and, therefore, the plaintiff was moved to appoint and continue the defendant, who was the nephew of Kaleiluhiole, in the same *status* as to the land and towards herself. The testimony as to what were the rights of Kaleiluhiole at and in Moanalua is not quite harmonious, but it is such that we arrive without hesitation at some conclusions of fact.

We first observe that Kaleiluhiole had been preceded by Kilinahe in the charge of the land. All the testimony is that he had the same holding as Kilinahe, who was summarily discharged by the owner because he was not pleased with his management. Yet there is nothing to support the idea that a life tenure had been abrogated. There is nothing to show that he was different from any other head man, luna or konohiki in charge of a chief's land.

As to Kaleiluhiole, the testimony of Lolua, w., Henry Makanahoa, Henry Kahanu, Ohule, Nalimu, Malao and Heu is to the effect that so far as the land was cultivated, the crop was the property of the owner, the landlord, who disposed of it by contract with the prison and the barracks. The testimony of the Marshal is that in buying poi for the prison he dealt with Kamehameha and not with Kaleiluhiole.

A part of the land was leased to Dr. Ford for planting rice, but there is no intimation that Kaleiluhiole leased it as the life tenant. A salt pond, supposed to be very valuable, was worked by and for account solely of Kamehameha. He employed Kaleiluhiole somewhat in this labor, but it is not set up that he required to get a concession from him, or that he made him any consideration whatever for the privilege of taking the salt. This does not look as if Kaleiluhiole had a life estate in Moanalua.

The defendant offers testimony to show that Kaleiluhiole

R. Keelikolani *v.* D. Manaku.

was placed in possession of Moanalua in consideration of the
affection and feeling of consanguinity entertained toward him
by Kamehameha in consequence of his mother having been a
nurse and foster-mother.  Let this be so.  It does not follow
that the measure of Kamehameha's gratitude was a life estate
in this land.  It may well have been a moving inducement
for making Kaleiluhiole, rather than some other man, the
head man of Moanalua.  The place was one of reward and
consequence to a Hawaiian.  As the head man, he enjoyed
the control of tenants who must work at his direction in labors
of which he enjoyed a part of the result.  While the yield
of the land was only what may be called domestic produce,
such as poi, pigs, poultry and fish from its ponds or sea-front,
the head man would partake of these liberally for his own
use, without account.  It was a superior position to that of
the kanaka who labored on the land.  Such a tenant of the
land accepted the conditions of yielding to his chief, as an
auhau ku i ka wa, as much of these products as he pleased to
take, and of the chief's residence on the land, with the bur-
den of entertaining him, for as long as he pleased, and still
considered that he had been promoted to a desirable position
in life.  He would maintain the relation of an affectionate
clansman, after the ancient Hawaiian custom, by rendering
service, which was reciprocated by his occupancy of the land
as the manager of it.

Such a holding as we have above spoken of was the *pono*
or privilege of Kaleiluhiole or any other head man in charge.
We have seen that whenever the land yielded or promised a
valuable product, such as rice, salt or taro, in a quantity be-
yond what was needed for the chief and his retainers, the
chief took such product or the proceeds, without pretension
of a partnership with his head man.  The testimony regarding
the fisheries in the ponds and sea is that the cash receipts
were at the call of the chief—they did not belong to any per-
sons in charge.

It does not conflict with this conclusion that the poi used by the prisoners while at work at the salt pond was not taken from Moanalua, for it does not appear that there was at that time a ripe crop at Moanalua; nor is it shown that it was the course of business for one employing prisoners to feed them; but otherwise it does appear that poi for the prisoners was delivered at the prison and taken account of there. The defendant bases his claim on a written tenure, which declares that he is *continued*, "hoomau aku," in the same privileges and position which was lately held and enjoyed by Kaleiluhiole, and it is testified that the written instrument was made at his request and given him as a certificate of his authority, which had been questioned by one of the tenants of the estate.

If the instrument had contained no other phrase, it is not likely the defendant would have claimed the exclusive estate (except the reservations) for life; but following the above quoted words, "hoomau aku," is "a mau loa," which may be interpreted "perpetually," and following is this sentence: "Aka hoi, ina e make e aku kuu kahu, o David Manaku, mamua o'u, alaila e hoi mai no ka aina o Moanalua me a'u a me ko'u mau hooilina," which translated is: "But, nevertheless, if my kahu, David Manaku, shall die before I do, then the land of Moanalua is to revert to me and my heirs." But we have seen that no life estate has been granted. The words used are of appointment, and not of grant, and this provision for reversion is therefore repugnant or senseless. The strongest construction which could be claimed for them is that they intend an appointment as an agent irrevocable. But an agent is not the owner of a life estate, without obligation to account for rents and profits.

It is urged that the defendant's predecessors did not keep accounts nor render account. This is an inference not well supported by the evidence. They appear to have paid on demand the cash receipts of the fisheries and to have given up

R. Keelikolani *v.* D. Manaku.

the whole of the merchantable taro crops, and to have made no pretension to even manage the salt crop, so that if they kept no account it was not necessary, because the landlord took everything. Such would have been the dealing of an old-fashioned Hawaiian chief, and by defendant's admissions in argument this plaintiff might take everything under the denomination of "Auhau ku i ka wa," only it would be unreasonable to do so—that is, in view of the tenant unreasonable, but perhaps not so in the mind of the owner.

It is to be observed that the times have changed and the mode of doing business since the death of Kaleiluhiole. The income of the land was then what might be produced by the labor of the kanakas or men living on it, who rendered koele labor. But the present manager has made cash leases to foreigners cultivating rice. The receipts have risen to more than three thousand dollars per year, which he claims for himself, under his appointment. This is something obviously unreasonable, without consideration, and not supported by the terms of the instrument.

Upon these views of the facts and the legal aspect of the case, we come to the same conclusion as that reached by the Chief Justice in the first instance.

A. S. Hartwell for plaintiff.

S. B. Dole and C. Brown for defendant.