## Witt et al. v. Commonwealth.

May 20, 1947.

Rehearing denied June 20, 1947.

James C. Carter, Judge.

Montgomery & Montgomery for appellants.

Eldon S. Dummit, Attorney General, and H. K. Spear, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY VAN SANT, COMMISSIONER —Reversing.

Appellants, Lee Witt, Willie Mason, Charlie Mason, and Henry Earl Haste, have appealed from a judgment of conviction of manslaughter under an indictment charging them with the murder of Chester Portman. Each received a sentence of seven years' confinement in the State Reformatory. We will review the evidence as briefly as possible.

Willie Mason and Lee Witt, in the latter's green 1938 two-door Chevrolet sedan, left Liberty for Lebanon at about 10:00 o'clock A. M., July 29, 1946, to procure beer and whisky. About a mile from Liberty, Chester Portman flagged them and gained permission to ride to Lebanon, where he previously had contracted to make some electrical installations. He placed his meter box and cable on the floor between the front and rear seats of the automobile. After arriving in Lebanon, he abandoned his original purpose and, with Mason and Witt, embarked on a spree. Between 12:00 and 1:00 o'clock they were joined by Charlie Mason and Henry Earl Haste; all five of the men continued drinking and purchased four fifths and one half pint of whisky before commencing their return journey in Witt's car at about 2:00 o'clock in the afternoon. Before leaving Lebanon they drank the half pint of whisky; they then opened one of the fifths and continued drinking throughout the afternoon. On their way they overtook Clay, Richard, and Floyd Overstreet, to whom they gave a drink of whisky and from whom they obtained five bottles of beer. Continuing their journey, they drank the beer and threw the empty bottles on the floor between the front and rear seats of the car. At about 3.30 o'clock they stopped at a filling station operated by Phineas McDonald on the outskirts of Mannsville. McDonald testified that the members of the party were drunk at

that time. They made various other stops, one at Hattie Goode's soft drink stand about eight miles out of Mannsville. She talked to the occupants of the car and observed Portman sitting in the right rear seat, at which time he was asleep and snoring. They also stopped at Sanders' Restaurant at Clementsville, where Maxine Clements, who was inside the restaurant, saw appellants and observed a fifth person, presumably Portman, lying on the floor in the rear of the car. They next stopped at Earl Wethington's store about seven and one-half miles north of Liberty. Wethington observed Portman in the rear of the car, his body lying on the seat at an angle, his legs and knees resting on the floor. After leaving Wethington's store they turned off of the main highway and drove over a rough graveled road at a high rate of speed, making an abrupt stop at the residence of Charlie Norman. The driver of the car backed into an automobile owned by Otis Helm which was parked in front of Norman's house. Helm and Norman on the one side and Witt and Haste on the other engaged in a fist fight. Witt was knocked down, his nose bloodied, and Haste received a black eye. Willie Mason stopped the fight and the party proceeded into Liberty. They drove through the town, reversed their direction, and traveled some two or three miles to Portman's home. When they arrived Willie Mason informed Portman's mother that her son was drunk in the car. At her request appellants carried him into the house and placed him on a bed; they then returned to their car and departed for their homes.

The facts thus far related are conceded to be true by both the Commonwealth and appellants; but the following evidence introduced by the Commonwealth was denied by appellants. Several witnesses testified that they saw a green two-door Chevrolet sedan, which they thought was a 1937 or 1938 model, parked on the highway near Mannsville at about 4:00 o'clock in the afternoon. None of the witnesses was acquainted with Portman or either of the appellants; however, four of the witnesses identified Portman from a photograph introduced in evidence. All of these witnesses testified that they saw fighting or scuffling in the parked automobile. One testified that he passed the automobile as he was driving from his home to Mannsville; two others esti-

mated that they were forty or fifty yards distant from the parked automobile; while others stated that they were approximately three hundred yards distant therefrom. None of these witnesses identified any of the appellants as being occupants of the car, but some of them testified that one of the occupants of the car was holding Portman while another was slapping or hitting him on the head. None of the witnesses could state whether Portman's assailant was hitting him with an instrument or merely with his hand or fist. Appellants deny that anybody assaulted Portman in their presence; but since they and Portman were the only occupants of the car, and they admitted they were parked in the vicinity testified to by the Commonwealth's witnesses, it is obvious that this evidence is sufficient to support a conclusion that an assault was committed, and that appellants were the assailants if it was committed. Billy Holt, the son of a tenant on the Portman farm, was at Portman's home when the latter was carried in. He testified that he smelled the odor of alcohol on Portman and saw him breathing after he was placed on the bed; but since Portman appeared to be injured, the witness left the house to call a doctor. Other witnesses testified that Portman was dead on arrival. The doctor, being of the opinion that the call was not urgent, did not immediately attend the patient. He was called a second time and arrived about 6:15 o'clock P. M., at which time Portman was dead. He said that death may have occurred as late as ten minutes or as early as two hours before his arrival. He made a thorough external examination of the body, which disclosed that the right upper lip was markedly swollen and bruised, the right side of the nose, cheek, and upper lid of the right eye were bruised; there was a moderate amount of hemorrhage in the right eye and its sclera was torn; there was a small amount of hemorrhage in, and a small lateral bruise near, the left eye. There was no break in the skin, no blood issuing from any of the wounds, and there was no other mark indicating violence on the body. The doctor stated that it was *possible* for death to have been caused by blows producing the wounds he described. There was evidence that the deceased was afflicted with a heart ailment, and the doctor stated that death *could* have been produced by over-indulgence in alcohol; he

testified that he could not determine which, if either, of the possibilities caused the death.

In addition to many rounds of drinks consumed by appellants and the deceased while they were in Lebanon, it was shown without contradiction that they drank five bottles of beer and two-thirds of a gallon of whisky between 2:00 o'clock P. M. and 6:00 o'clock P. M. when the party arrived at Portman's home. Appellants contend that Portman lost consciousness from over-indulgence in alcohol, and present the theory that the injuries to Portman's face were inflicted by the bottles and electrical instruments on the floor of the car while they were riding over the rough country road, and when they struck the Helm car. They likewise contend that death directly was caused by over-indulgence in alcohol.

Several grounds are urged for reversal, the most serious of which is that the Court erred in overruling appellants' motion for a directed verdict of acquittal, because the evidence is not sufficient to support the finding that Portman died as a result of an assault upon him by appellants. Whilst appellants denied committing an assault on the deceased, we repeat: the evidence amply is sufficient to support the jury's finding that an assault was committed, and that it was committed by appellants. But we are constrained to hold that the evidence suggests two possible causes of death, and the selection of one and rejection of the other would call for mere speculation on the part of the jury. None of the wounds described in the evidence appeared at a place calculated to produce death, except through the medium of an internal hemorrhage; and the meager expert evidence indicates that no internal hemorrhage occurred. There was no evidence of a fracture, and the testimony of the embalmer indicates that there was no rupture or leakage in the vascular system when the body was embalmed. No post mortem operation was performed, and the only doctor to testify frankly stated that he did not know the cause of death, as he could not determine from his findings whether death was caused by over-indulgence in alcohol and its effect upon a weakened heart, or by a blow to the head and its possible effect upon the deceased. In Denham v. Commonwealth, 239 Ky. 771, 40 S. W. 2d 384, 386, the Court sets forth the elements necessary to be proved beyond a reason-

able doubt in the establishment of the corpus delicti: "Before a man may be convicted of murder, there must be proof beyond a reasonable doubt that a murder has been committed and that he is guilty of committing it. This is commonly called establishing the corpus delicti. From domestic and foreign cases, Roberson deduces the following well-stated rule in section 1779 of his book on Kentucky Criminal Law and Procedure: 'To sustain the charge of a criminal offense there must be proved: first the corpus delicti, the fact of the crime; and secondly, that the accused committed the offense charged against him. Corpus delicti means the fact that the particular crime alleged has been actually committed by some one, and is made up of two elements: first, the existence of a certain act or result forming the basis of the criminal charge; and, second, the existence of criminal agency as the cause of this act or result. The corpus delicti may be established by circumstantial evidence as any other fact in the case.'"

In Tarkaney v. Commonwealth, 240 Ky. 790, 43 S. W. 2d 34, 41, the Court said: "The first question in this case is: Has a man been slain? We have direct evidence of death. Next we must look for *clear and cogent* evidence that the death is the result of some criminal agency." (Emphasis ours.)

In establishing that death is the result of a criminal agency, it is not sufficient merely to establish that a crime has been committed; death must be shown to have been the result of the crime proved. It is not always necessary to prove the cause of death by medical testimony. As pointed out in the Denham case, such a fact, as any other, may be proved by circumstantial evidence. But where circumstantial evidence alone is relied upon to establish the cause of death, the facts proved must be such that a layman of average intelligence would know of his own knowledge, gained from his own experience, that the injuries described are sufficient to produce death. Commonwealth v. Sullivan, 285 Ky. 477, 148 S. W. 2d 343. None of the blows to Portman's face was delivered with sufficient force to break the skin; the tear to the eye was a mere surface wound; it did not penetrate the brain; and there was no evidence of a fracture or internal hemorrhage. Since the medical testimony as to the cause of death was neutral, the jury could de-

termine that death resulted from a criminal agency only from the nature of the wounds described; and such determination in a criminal case must be made to the exclusion of a reasonable doubt. Applying the rule in the cases above cited: We have evidence of death; we also have evidence that the crime of assault and battery was committed; but we do not have clear and cogent evidence that death was the result of the crime. By clear and cogent evidence we do not mean that the evidence must be without contradiction, or such as to command belief; but it must present more than a mere possibility of the existence of the fact or the happening of the act which the jury is called on to determine. Fractures of the skull often produce death, and such is of common knowledge; but mere superficial bruises to the face or superficial rents in the skin or to the outside covering (sclera) of the eye seldom, if ever, produce death, and this also is of common knowledge. Because the wounds observed by the attending physician were of such superficial character, he refused to express an opinion that the force which produced them caused the death of the person upon whom they were inflicted; and, for the same reason, we hold that they do not present cogent evidence for the Court or jury to so conclude as an ultimate fact. That being true, the Commonwealth failed to establish the corpus delicti, not because the evidence fails to show that death occurred or that a crime was committed, but because it fails to show that the crime, if committed, was the cause of death. On return of the case, if the evidence substantially is the same, the Court will direct the jury to return a verdict of not guilty. But since the evidence may not be the same, it will be necessary for us to consider other grounds urged for reversal.

Appellants contend that they were entitled to instructions on (1) self-defense, (2) accidental death, and (3) death caused by heart failure due to over-indulgence in alcoholic beverages. The contention that they were entitled to an instruction on self-defense is without merit. All of the appellants testified, and none contended that the injuries inflicted on Portman were inflicted by them, or either of them, in self-defense. Under these circumstances, the Court should not give such an instruction. Pelfrey v. Commonwealth, 247 Ky. 484, 57 S. W. 2d 474. But the evidence presents a different picture

in respect to accidental death and death caused solely by the use of alcohol. Witnesses for the Commonwealth placed Portman in an unconscious condition on the floor of the car. There is an entire absence of evidence of motive for the assault; on the contrary, it was shown that appellants and the deceased were good friends, and had engaged in no previous altercation with each other. Their conduct following the alleged assault is not consistent with guilty knowledge: They openly exposed the body of the deceased to several of the witnesses after they allegedly committed the assault; and they delivered him in person to his home. Ordinarily murderers do not fasten guilt on themselves in this fashion. Under all the circumstances of the case, it is not improbable that the bottles and meter box produced the injuries to Portman's face, and that this occurred without notice to his drunken companions. Thus it will be seen that appellants' theory of accidental death should have been submitted to the jury, if the evidence had been sufficient to submit the Commonwealth's theory. The medical testimony introduced by the Commonwealth required the Court to give an instruction on the theory that the deceased came to his death solely as the result of heart failure superinduced by over-indulgence in alcohol, especially since the jury would not be required to adopt this theory or the theory of accidental death by belief beyond a reasonable doubt. Although the Commonwealth's evidence contradicts that of the accused and their witnesses, the accused were entitled to have their theories of the case submitted to the jury by proper instructions. Shelton v. Commonwealth, 145 Ky. 543, 140 S. W. 670. On the next trial, if the evidence is sufficient to submit the case to the jury, and the evidence in support of appellants' theories substantially is the same, the Court will instruct the jury on accidental death and heart failure caused by over-indulgence in alcohol.

We now will consider the contention that the Court erred in admitting incompetent evidence and in rejecting competent evidence. The only doctor to testify was permitted to explain to the jury the manner in which a fracture of the skull may cause death. This was error, because there was no evidence of such a fracture and it opened up another avenue for mere speculation on the part of the jury. The Trial Court sustained an objection

to a question propounded to the undertaker. In counsel's avowal he stated that the undertaker, if permitted to answer the question, "would state if there was any break anywhere in the circulatory system of a person being embalmed, when the embalming fluid was inserted in the body, it would leak out and show the presence of any fracture or break in the skin of the body being embalmed." Since it was shown by the embalmer that the fluid did not leak out when Portman's body was embalmed, this evidence was pertinent and, in the absence of contradiction, would tend to eliminate at least one, if not the only, medium through which blows to the face could have caused the decedent's death. If this testimony is offered on the next trial, the Court will permit it to be introduced.

It is unnecessary for us to consider the contention that the Court erred in overruling appellants' motion to discharge the jury, because the circumstances relied on in support of this contention likely will not occur again.

The judgment is reversed, with directions to grant appellants a new trial, and that it be conducted in conformity with this opinion.