36620. KILGORE *v.* THE STATE.

DECIDED APRIL 2, 1957.

*Shirley C. Boykin, R. D. Tisinger,* for plaintiff in error.

*Wright Lipford, Solicitor-General, Earl Staples, Robert Brown,* contra.

TOWNSEND, J. █ Special grounds 1, 2, 3 and 4 complain of the admission of evidence relating to the ill-treatment by the

defendant of his wife. Most of the testimony related to acts within a week of her death, but some of the testimony showed that the defendant had habitually ill-treated his wife over a period of years. Such evidence, if not too remote, is admissible to show malice and motive, and to rebut the presumed improbability of a husband murdering his wife. *Parker* v. *State,* 197 *Ga.* 340 (6) (29 S. E. 2d 61). And while ordinarily evidence relating back over a period of years has little, if any, probative value, yet under the facts of this case, where a consistent habit of ill-treatment is shown over a long period of time, none of the acts testified to were too remote to be admitted in evidence. See *Josey* v. *State,* 137 *Ga.* 769 (1) (74 S. E. 282). These grounds are without merit.

■ Since there is no law requiring a party to litigation to call to the stand every person to whom a subpoena has been issued, there is no merit in special ground 5, complaining that after the State had subpoenaed a medical witness it failed to use him.

■ Special ground 6, contending that there was insufficient evidence of one of the elements of proof of corpus delicti, is considered in connection with the general grounds. In *Daniel* v. *State,* 126 *Ga.* 541, 542 (55 S. E. 472) it is held as follows: "The burden was upon the State to show beyond a reasonable doubt, not only that the accused inflicted a wound under such circumstances that if death ensued the accused would be guilty of murder, but also to a like degree of certainty that death actually resulted from the wound inflicted. Until this was done, the burden was not shifted to the accused." That there must be some evidence of causal relationship between the wound inflicted and the resultant death, see *Wilson* v. *State,* 190 *Ga.* 824 (2) (10 S. E. 2d 861). In *Payne* v. *Chandler,* 41 *Ga. App.* 385 (2) (153 S. E. 96) it is stated: "The mere fact that one event chronologically follows another is alone insufficient to establish a causal relation between them. Post hoc non propter hoc. Evidence that a woman suffered a pain in her heart . . . after having swallowed a liquid, the nature and character of which does not appear . . . is, in the absence of evidence as to any facts tending to show a causal relation between the woman's physical condition and the swallowing of the liquid, insufficient to author-

ize an inference of fact that her condition was caused by the swallowing . . . of the liquid."

In this case there is evidence from which the jury might well conclude that the defendant hit his wife over the head with a stick; that this blow was of sufficient force to bruise the head down to the skull itself, and that its effects were still apparent when she died. They might also well conclude that she died, either from the brain tumor, or from the effect of the blow in conjunction with brain tumor. The defendant would be guilty if the injury materially accelerated death, although proximately occasioned by pre-existing cause. *Wilson* v. *State*, 190 *Ga.* 824, 829 (2) (10 S. E. 2d 861). Since such a blow on a normally healthy person would not ordinarily be expected to produce death, the question of relationship between the force of the blow and its effect on the victim's pathological condition enters a field where expert testimony is of utmost importance. Neither the layman sitting on the jury nor the judges of this court may be expected to calculate the effects of increased pressure on brain tissue already exposed to great pressure from the presence of a large tumor within the skull. The only testimony from which such relationship might be inferred is from a medical witness as follows: "Based upon my examination of the bruise on the head and of the brain, what in my opinion caused the death of Mrs. Kilgore, I say honestly, based only on those things, it would be kind of hard to say. . . And based strictly on my own findings, I don't think it would be possible for me to say what the cause of death was. . . A tumor growing gradually, of course, exerts a pressure but as it exerts a pressure, the brain is sort of absorbed or dies off or undergoes a sort of degeneration around where the pressure is exerted, so that in the slow growth of the tumor, ordinarily, there is not any great increase in pressure, although under a variety of circumstances an increase of pressure could occur. Usually there is some slight increase in pressure with this slow growth of the tumor. . . Stating as to what effect a lick on the top of the head would have as to hastening the death of that individual, I think that a lick on top of the head could perfectly well so disturb the—I mean produce inflammation or irritation of the brain and the tissues in there which is

already diseased by the presence of the tumor, could cause an increase in pressure, and could cause any number of symptoms due to pressure on the brain and could hasten the death from the tumor. . . (The blow) did not fracture the skull or do any damage that I could visibly see to the brain, that's right. Now, Mrs. Kilgore did have a fairly substantial brain tumor. The tumor was a disease that until corrected would cause death. . . . And in fact it did cause it, in my judgment after examining all the rest of the body and finding no abnormalities—in other words, whether it is my judgment that it did cause the death, I think the basic cause of her death was the brain tumor. . . . The growth of that organism in the brain either must make the brain disintegrate to a certain extent to make room for it, or the brain will ultimately be subjected to pressure that pushes the brain down into the canal through which the spinal cord makes its exit from the brain. That will cause death when that occurs. To say whether or not that did occur at the time of her death, it is impossible to say positively, but we presume that was the manner of her death."

It will be observed that this testimony is barren of any inference that the blow, which the woman received some 6 days before her death (or any other of the acts of maltreatment) did or would even be likely to accelerate the death of a person suffering with her disability. Although, in *Long* v. *State*, 60 *Ga. App.* 517 (4 S. E. 2d 75) a conviction was affirmed although the medical witnesses refused to give their opinion as to the cause of her death, in that case there was no other cause of death suggested by evidence except the wound inflicted by the defendant, whereas here the witness testified that the tumor caused the death. Judge Guerry, dissenting in the *Long* case, had this to say (p. 522): "In spite of the testimony of experts who swear they could only speculate as to the cause of the death, may a jury say, or may this court say, 'We know and are convinced beyond a reasonable doubt that the wound inflicted caused the death?' . . Can it be said that the jury's common knowledge is so superior to that of the sworn expert witnesses that it knows absolutely, while the experts (the doctors) still 'see through a glass darkly?' " The evidence in this case is insufficient to show,

even hypothetically, a causal relationship between the blow and the death, for which reason the conviction must be reversed.

The trial court erred in denying the motion for new trial.

*Judgment reversed. Gardner, P. J., and Carlisle, J., concur.*