**Polee ARMSTRONG, Appellant,**

v.

**STATE of Alaska, Appellee.**

**No. 1337.**

Supreme Court of Alaska.

Nov. 3, 1972.

---

James C. Merbs, Ernest Z. Rehbock, Anchorage, for appellant.

John E. Havelock, Atty. Gen., Juneau, Seaborn J. Buckalew, Jr., Dist. Atty., Charles M. Merriner, Asst. Dist. Atty., Anchorage, for appellee.

Before BONEY, C. J., and RABINOWITZ, CONNOR, ERWIN and BOOCHEVER, JJ.

## OPINION

ERWIN, Justice.

Appellant, Polee Armstrong, appeals from a conviction by jury verdict of manslaughter in connection with the death of his wife, Corrine Armstrong. The central issue at trial concerned the cause of her death. On appeal appellant complains of deficiency in proof on that issue, contends that the trial court erred in admitting photographs of the deceased, and alleges prejudice from certain comments made by the district attorney to the jury during closing argument and to the trial judge prior to sentencing.

## SUFFICIENCY OF THE EVIDENCE

■ We begin with appellant's primary assertion on appeal, that the state failed to prove, by evidence sufficient to support a conviction, a criminal cause of death. This contention was raised at trial by appellant's motion for a judgment of acquittal.[1] In assessing such a motion the test to be employed is the one enunciated in Bush v. State, 397 P.2d 616, 618 (Alaska 1964), where we said:

> On a motion for a judgment of acquittal the judge must take the view of the evidence and the inferences therefrom most favorable to the state. If he determines that fair minded men in the exercise of reasonable judgment could differ on the question of whether guilt has been established beyond a reasonable doubt, then he must submit the case to the jury.

(Footnotes omitted.) [2]

Having noted the proper standard, we turn to a consideration of the evidence relevant to cause of death.

Corrine Armstrong died during the early evening of Christmas day, 1969, in the house trailer residence of the Armstrongs.

Officer Moerlins, who investigated the death, testified that numerous bruises and lacerations were visible about Corrine's head and that it appeared to him to have been a violent death. He further testified that furniture in the trailer bedroom was overturned and that there was blood on the closet door mirror. The extent of the deceased's injuries was also illustrated by a series of photographs.[3] Appellant was subsequently charged and tried on the theory that he had unlawfully struck his wife about the head and that these blows were a proximate cause of her death.

Appellant does not contend on appeal that insufficient evidence was produced at trial to permit the jury to conclude that the multiple head injuries suffered by Corrine prior to her death had been inflicted by appellant;[4] however, appellant does challenge as insufficient to support a guilty verdict the evidence which tended to show that those injuries contributed to Corrine's demise. In particular, appellant relies on the inability of the state's expert medical witness to testify with medical certainty that blows to Corrine's head had such a contributory effect.

1. Motions for judgments of acquittal are provided for in Crim.R. 29.

2. Our recent cases have reaffirmed this standard. Davis v. State, 499 P.2d 1025 (Alaska 1972); Condon v. State, 498 P.2d 276 (Alaska 1972); Trounce v. State, 498 P.2d 106 (Alaska 1972); Tarnef v. State, 492 P.2d 109, 117 (Alaska 1971); Jordan v. State, 481 P.2d 383, 387 (Alaska 1971).

3. We deal separately with appellant's claim that the admission into evidence of the photographs constituted error.

4. During the trial the state introduced evidence of several inconsistent exculpatory statements along with an admission of guilt made by appellant. Officer Moerlins testified that on the night of Corrine's death appellant, who was found in close proximity to the house trailer, stated that "he didn't know what happened because the last time he had seen [Corrine] she was in the trailer and she was all right." In constrast, Corrine's mother and sister both testified that later that evening appellant had told them that Corrine had been sick and had died in bed. On the day following Corrine's death, appellant made a formal written statement in which he denied having struck his wife and claimed that her head injuries were the result of several falls. Finally, one of appellant's neighbors testified that on the night of Corrine's death, but prior to the arrival of the police, appellant had entered his house trailer in an excited mood and exclaimed several times, "I just killed my wife."

The state's medical expert, Doctor Rogers, testified that although Corrine had consumed a large amount of alcohol prior to her death, her head injuries were not likely results of falls "because they were located on both sides of her head and on the back of the shoulders, the front of the shoulders, cheeks." Additionally, Officer Moerlins described the interior of the house trailer which was in considerable disarray, evidencing a possible struggle.

To establish cause of death, the state called Dr. Ronald Rogers, a pathologist who performed an autopsy on Mrs. Armstrong. Dr. Rogers testified that the primary cause of death was asphyxiation resulting from the blockage of Corrine's wind passage by a dense and viscus mucous clot located at the vocal cords in the larynx. He further testified that such a mucous clot ordinarily would have been expectorated automatically by an innate coughing reflex; however, in the case of the deceased, deep unconsciousness inhibited that innate reflex, and asphyxiation resulted. Two possible causes of the reflex-inhibiting unconsciousness were revealed by the autopsy: excessive alcohol consumption and blows to the head. Dr. Rogers testified that in his opinion both factors contributed to the depth of unconsciousness and thus to Corrine's death.[5] On cross-examination the doctor conceded that he could not isolate which factor was the cause of death and that a reflex-inhibiting state of unconsciousness could have resulted solely from the extremely high blood-alcohol level. He further testified, however, that in the absence of any one of the factors in this case, the victim might have survived.[6] Appellant argues that this

5. Dr. Rogers testified:

[t]he cause of death I think was not the result of one single thing, it was a combination of ingredients as it were. There were 3 rather discrete findings, all contributory. The one factor which was the—sort of the coup de grace so—so to speak was a plug of very dense, very viscus mucus, located in the larynx. . . . But there are 2 other factors which I believe played a roll. . . . One was her blood alcohol level was extremely high. The blood alcohol level was 344 milligrams percent and the urine was even higher, 432. Now 344 milligrams percent in the blood would render most casual drinkers at least unconscious, without any doubt. . . . And, the other thing was that there were a number of bruises and larcerations and abrasions on her head and her neck and her shoulders.

And subsequently:

[The] fact that the mucous was there is normal but the fact that she was unable to cough it up is not normal and the fact that she was not, I think again was because she was suffering from the effects of high alcohol and damage to her head, not her brain, her head.

6. Dr. Rogers testified:

Q. Can you say with any certainty what caused Mrs. Armstrong to lose consciousness?

A. No, I wouldn't be able to say which of the 2 factors which contributed to it was the most important but I think there are 2 fairly obvious reasons why she might have been unconscious and which was the most important I'm—I just can't really say without knowing more about her background and so on.

Q. Even knowing her complete background, in a medical sense, if it's imposisible to say whether one or the other is responsible, it's entirely possible that —that the blows had nothing to do with her passing out, is that correct or not?

A. She could have been unconscious from the alcohol alone. She could have been unconscious from the blows alone.

* * * * *

A. . . . All I can say is that she did have a number of bruises on her head which might well have caused her to be unconscious. The alcohol alone might well have caused her to be unconscious, but the 2 of them together obviously did cause her to be unconscious because she was unconscious.

* * * * *

Q. All right. Well, so if the person —Doctor, in your experience, and I don't know whether you can answer this or not, but a person who—even an experienced drinker who is still conscious but who had developed the state of intoxication that this woman apparently had, is she more readily rendered unconscious in that state than she would be if she were completely sober?

A. I would think so. There's not as far to go if one is already halfway unconscious there's less to accomplish to get the rest of the way, I suppose.

* * * * *

Q. And assuming that she was rendered unconscious from the blows which appeared from her—from your examination of the cadaver, if she were rendered unconscious and thereby causing her to sink into the law state of—of unconsciousness or low conscious level, this would have caused her death also, is that correct? And assuming that's what happened, just assuming that she was rendered unconscious, already being

concession necessitated a judgment of acquittal. We disagree.

█ The fact that the victim died from the combined effects of a pre-existing disease or condition and a blow or wound maliciously inflicted by the defendant does not relieve the defendant of liability.[7] When a person inflicts a blow or wound upon another

[i]t is well settled that the consequences of an act which is the efficient cause of the death of another are not excused, nor is the criminal responsibility for causing death lessened, by the pre-existing physical condition of the person killed, at the time the act was done, or by his low vitality, which rendered him unable to withstand the shock of the wound inflicted, and without which pre-existing condition the blow would not have been fatal, if a causal connection between the blow and the fact of death is made to appear. Accordingly, the fact that the victim died from the combined effects of the wound maliciously inflicted by the defendant and a disease not connected with the wound does not relieve the defendant of liability.[8]

█ Expert testimony is not necessarily essential to support a conviction of homicide. Thus, where it is apparent that ordinary laymen could perceive, from such factors as the nature of the wound or the circumstances surrounding an attack, that a defendant's acts caused the death, medical testimony as to cause of death is not essential.[9] A contrary result is reached, however, where from the nature of the agency alleged to have caused the death, the causal connection is not within the

---

in the drunken condition she was in, the fact that being rendered unconscious at that state also caused her death, is that correct, because she was not able to expectorate the plug?

A. Well that's—yes, that's the reason that she died, because of the mucus plug. If she had not had the mucus plug, it had not accumulated, she might have—she might have survived.

Q. She might have survived the blows or she might have survived the—and also the alcoholic state?

A. Yes. I think in the absence of any one of those 3 factors she might have survived.

 * * * * *

Q. Let me ask you this question, Doctor, viewing the body and having performed the autopsy on it, taking in mind that you have bruises and cuts and abrasions that you saw, do you have an opinion as to what caused the unconsciousness in this particular woman?

A. Yes.

Q. What?

A. A combination of the high alcohol level and the bruises.

7. I Anderson, Wharton's Criminal Law and Procedure, § 197 at 446 (1957).

8. I Anderson, Wharton's Criminal Law and Procedure, § 201 at 450–55 (1957); See DeVaughn v. State, 232 Md. 447, 194 A.2d 109 (1963), cert. denied 376 U.S. 927, 84 S.Ct. 693, 11 L.Ed.2d 623 (1964); State v. McClain, 256 Iowa 175, 125 N.W.2d 764 (1964); Houston v. State, 220 Miss. 166, 70 So.2d 338 (1954); Vesey v. Vesey, 54 N.W.2d 385 (Minn. 1952); Hollywood v. State, 120 P. 471 (Wyo.1921); Dumas v. State, 159 Ala. 42, 49 So. 224 (1909); People v. Cione, 293 Ill. 321, 127 N.E. 646 (1920); Hopkins v. Com., 117 Ky. 941, 80 S.W. 156 (1904); Griffin v. State, 40 Tex.Cr.R. 312, 50 S.W. 366 (1899).

The trial court instructed the jury properly in this regard. Instruction number 12 provided as follows:

If a person unlawfully inflicts upon another person a physical injury which is a proximate cause of the latter's death, such conduct of the former constitutes an unlawful homicide even though the injury, physical condition or other cause and although it is probable that a person in sound physical condition thus injured by the blow of the defendant would not have died from that injury alone, although it is probable that the injury inflicted by the defendant only hastened the death of the injured person and that he would have died soon thereafter anyhow from another cause or causes.

9. Harvey v. Commonwealth, 318 S.W.2d 868 (Ky.1958); State v. Minton, 234 N.C. 716, 68 S.E.2d 844, 847–848 (1952); Morris v. State, 168 Tex.Cr.R. 29, 322 S.W.2d 632, 633–634 (1959); State v. Engstrom, 79 Wash.2d 469, 487 P.2d 205, 210 (1971); Annot., 31 A.L.R.2d 693 (1953).

average layman's perception. In such circumstances, expert testimony is essential to support a conviction.[10]

■ In the present case, the causal connection sought to be established was beyond the understanding of the average layman.[11] Expert testimony therefore was necessary for the state to establish its case; in the absence of such testimony, any deliberation by the jury as to cause of death would have been baseless conjecture.

In this case expert testimony served to reveal the physiological relationships relevant to Corrine's death; once these were explained, the jury was competent to make an independent determination of cause of death on the basis of all the relevant evidence before it.

■ Our study of the record of the trial below convinces us that sufficient evidence was produced to present a jury question on the issue of cause of death. Expert testimony presented by both parties established asphyxiation as the primary cause of death. Dr. Rogers indicated a causal con-

nection between the beating and asphyxiation, namely as a factor which, along with extreme intoxication, contributed to the depth of the reflex-inhibiting unconsciousness. Even the defense expert witness, Dr. Michael Beirne, admitted that the head injuries were a "minor" contribution to Corrine's death, being sufficient to "cause a certain additional grogginess . . . . " Additionally, the jury had before it the testimony of Officer Moerlins who detailed the condition of the trailer and the deceased as he found them. The extent of the beating suffered by Corrine was also illustrated by photographs. Viewed most favorably to the state, this evidence was sufficient to permit the jury to conclude, with the strength of conviction required for a guilty verdict, that the acts of appellant contributed to Corrine's demise.[12]

## CORPUS DELICTI

In a closely related claim of error, appellant asserts that the state failed to establish the corpus delicti of manslaughter [13]

---

10. Kilgore v. State, 95 Ga.App. 462, 98 S.E.2d 72 (1957); Witt v. Commonwealth, 305 Ky. 31, 202 S.W.2d 612, 616 (1947); State v. Lusk, 452 S.W.2d 219, 222–223 (Mo.1970); Annot., 31 A.L.R. 693 (1953). *Cf.* West v. State, 409 P. 2d 847, 849–850 (Alaska 1966).

11. Larcerations and bruises about Corrine's head were relatively superficial, would have required only minor treatment, and would not alone have caused death.

12. The jury was properly instructed regarding the necessary causal connection between an unlawful assault and battery by appellant and Corrine's death. In part the jury was instructed:

By proximate cause is meant a direct cause, that is, a cause which, by direct and natural sequence, produced the death in question. To say it differently, the proximate cause of a thing is that cause which produces it and without which it would not have happened. A proximate cause is a real cause, as opposed to a remote cause.

This does not mean that the law seeks and recognizes only one proximate cause of a result, consisting of only one factor, one act, one element or circumstance,

or the conduct of only one person. To the contrary, the acts and omissions of two or more persons or causes may work concurrently as the efficient cause of death, and in such a case, each of the participating acts or causes is regarded in law as a proximate cause.

13. Professor Wigmore discussed the meaning of the term "corpus delicti" in the following language:

The meaning of the phrase *"corpus delicti"* has been the subject of much loose judicial comment, and an apparent sanction has often been given to an unjustified broad meaning. It is clear that an analysis of every crime, with reference to this element of it reveals three component parts, *first*, the *occurrence* of the specific kind of injury or loss (as, in homicide, a person deceased; in arson, a house burnt; in larceny, property missing;) *secondly*, somebody's criminality (in contrast, *e. g.* to accident) as the source of the loss,—these two together involving the commission of a crime by *somebody;* and, *thirdly*, the accused's *identity* as the doer of this crime. (emphasis in original)

VII Wigmore, Evidence, § 2072 at 401 (3rd Ed. 1940).

by evidence other than the purported admission and inconsistent exculpatory statements made by appellant.[14]

 It is a settled principle of American jurisprudence that a criminal conviction must rest on firmer ground than the uncorroborated confession or admission of an accused.[15] To avoid convicting a person solely out of his own admissions, the law requires, for a case to be submissible to the trier of fact, additional independent evidence. Thus, in a homicide case, there must be independent evidence of (1) the fact of death which (2) was caused by criminal agency of another[16] before the question of guilt of this defendant could be submitted to the jury. Appellant argues that there must also be independent proof of the third element—that he commmitted the crime, without reference to his admissions, but we find no legal authority[17] to support this position and decline to adopt such a rule in Alaska.

 There is a wide diversity among jurisdictions as to the extent of corroborative evidence necessary, particular formulas ranging from evidence tending to establish the corpus delicti to proof of the corpus delicti beyond a reasonable doubt.[18] We feel that the proper and most workable rule is the one laid down for the federal courts in Opper v. United States, 348 U.S. 84, 75 S.Ct. 158, 99 L.Ed. 101 (1954), where the court held that corroborative evidence need not be sufficient, independent of the statements, to establish the corpus delicti. Rather, the prosecution must introduce "substantial independent evidence which would tend to establish the trustworthiness of the statement." *Id.* at 93, 75 S. Ct. at 164, 99 L.Ed. at 109. The court stated:

Thus, the independent evidence serves a dual function. It tends to make the admission reliable, thus corroborating it while also establishing independently the other necessary elements of the offense. (Citation omitted)[19]

*Id.* Of course, the independent evidence taken together with evidence of extra-judicial statements by the accused must be sufficient to establish, beyond a reasonable doubt, all elements of the corpus delicti.

 We have previously reviewed the substantial independent evidence which tended to establish a homicide and, thereby, corroborate the evidence of an extra-judicial admission of guilt by defendant. The trial court did not commit error in admitting evidence of extra-judicial statements by appellant.

 Appellant additionally argues that the trial court erred in admitting the evidence of extra-judicial admissions prior to independent proof of a criminal cause of death.[20] Although it is desirable for

---

14. The evidence introduced by the state concerning extra-judicial statements by appellant is summarized in note 4, *supra*.

15. *See generally* Perkins, The Corpus Delicti of Murder, 48 Va.L.Rev. 173 (1962); Note, Proof of the Corpus Delicti Aliunde the Defendant's Confession, 103 U.Pa.L. Rev. 638 (1955); VII Wigmore, Evidence §§ 2070–2074 at 393–406 (3d ed. 1940); Annot., 45 A.L.R.2d 1316 (1956).

16. People v. Cullen, 37 Cal.2d 614, 234 P.2d 1, 6 (1951); Romero v. People, 170 Colo. 234, 460 P.2d 784, 787 (1969); State v. Doyle, 201 Kan. 469, 441 P.2d 846, 853 (1968); State v. Fischer, 232 Or. 558, 376 P.2d 418, 419 (1962); VII Wigmore, Evidence § 2072 at 401 (3d ed. 1940).

17. Note, Proof of the Corpus Delicti Aliunde the Defendant's Confession, 103 U.Pa.L.Rev. 638, 651 (1955).

18. *See* cases collected in Note, Proof of the Corpus Delicti Aliunde the Defendant's Confession, 103 U.Pa.L.Rev. 638, 659–665 (1955).

19. The federal corpus delicti rule has been adopted by several states. *See e. g.*, State v. Hale, 4 Haw. 269, 367 P.2d 81, 84–85 (1961); State v. Paris, 76 N.M. 291, 414 P.2d 512, 515 (1966).

20. The state's medical expert, Dr. Rogers, was unavailable the first day of trial. In admitting the statements the court indicated that if the state "does not link this up tomorrow . . . the [evidence] will be struck and very likely a mistrial will be allowed."

there to be an orderly presentation of proof,[21] it is well established that the order of proof is within the sound discretion of the trial court.[22] An abuse of that discretion would appear where, because of probable confusion of issues by the trier of fact, an accused is denied a fair trial. Our examination of the trial record does not reveal any such probability of confusion.

## PHOTOGRAPHS

In Stevens v. State, 443 P.2d 600, 603 (Alaska 1968), cert. denied 393 U.S. 1039, 89 S.Ct. 662, 21 L.Ed.2d 586 (1969), we held that:

> a photograph is admissible in evidence in the discretion of the trial judge, as an aid to the court or jury, after it has been shown to be a faithful representation of whatever it purports to depict, provided it is relevant, and provided its evidentiary value is not outweighed by any prejudice it might create. (Footnote omitted.) [23]

Appellant contends that four color photographs of the deceased, admitted at trial over defense objections, inaccurately represented the condition of Corrine Armstrong at the time of her death, were irrelevant, and were unduly prejudicial.

Officer Moerlins testified that the photographs, apparently taken during or soon after the autopsy performed by Dr. Rogers, "fairly accurate[ly]" reflected the condition of the deceased as she appeared soon after her death. However, appellant argues that the trial court was nevertheless obligated to rule the proffered evidence inadmissible because Officer Moerlins conceded that the photographs were tinged with a slight purple hue and depicted several small incisions apparently made during the autopsy by Dr. Rogers.[24] We do not agree. The minor discrepancies noted by Officer Moerlins were pointed out to the jury and cautionary instructions were given.[25]

Nor can we agree that the photographs were irrelevant or unduly prejudicial. The photographs illustrated the testimony of Officer Moerlins and Dr. Rogers concerning the bruises and lacerations suffered by the deceased as well as Dr. Rogers' testimony regarding the proba-

21. It would appear to be better practice to require independent proof of the corpus delicti before a confession is admitted into evidence in order to permit the court to weigh the issue properly.

22. People v. Cullen, 37 Cal.2d 614, 234 P.2d 1, 7 (1951); McIntosh v. State, 86 Nev. 133, 466 P.2d 656, 658 (1970); State v. Brown, 485 P.2d 444, 446 (Or. App.1971); VII Wigmore, Evidence § 2073 at 404 (3d ed. 1940); Annot., 45 A.L.R.2d 1316, 1338–1341 (1956). Cf. Pedersen v. State, 420 P.2d 327, 337–338 (Alaska 1966).

23. See also Condon v. State, 498 P.2d 276 (Alaska 1972); Sleziak v. State, 454 P.2d 252, 260–261 (Alaska), cert. denied 396 U.S. 921, 90 S.Ct. 252, 24 L.Ed.2d 202 (1969); Maze v. State, 425 P.2d 235, 239–240 (Alaska 1967); Watson v. State, 387 P.2d 289, 294 (Alaska 1963); McIntyre v. State, 379 P.2d 615, 617–618, 8 A.L.R.3d 1231 (Alaska 1963).

24. Appellant additionally notes that Dr. Beirne, the expert medical witness called by appellant, testified that in his opinion two of the photographs had been taken after embalming and that "frequently embalming fluid will make a bruise look bigger or brighter . . . ." Appellant did not renew his objections to the photographs on the basis of this testimony. Since Dr. Beirne only suggested the possibility of a heightened effect we will not consider his testimony under a plain error analysis.

25. Regarding the color tone of the photographs, the court stated:
> I will caution the jurors that color photographs sometimes stand out a little more vividly, but unless they are unusually so I'm going to allow them
> . . . .
The court further cautioned the jury regarding the incisions:
> I will caution the jurors that in the photographs that you examined, those 2 red spots that appear to have been made other than by bruises, perhaps by the physician, to be disregarded as far as the exhibit itself is concerned. The exhibits were admitted merely to show the bruises and cuts that were alleged by the state.

ble cause of the injuries and their contributory effect to Corrine Armstrong's death. They were therefore relevant.[26] Nor is there anything unusually gruesome or repulsive about the photographs which would have made them more harmful than illuminating. The trial judge did not abuse his discretion in admitting the photographs.[27]

## CLOSING ARGUMENT

Appellant chose not to testify below. However, as previously noted, the prosecution introduced evidence of several inconsistent extra-judicial statements allegedly made by appellant concerning his wife's death. In closing argument the prosecution commented on those statements as follows:

> But the truth of the matter is he told so many stories about this that you know here, don't you, you know right now that you cannot believe his accounting of what happened. And the judge is going to tell you that if you find that somebody says something that is not true that you may distrust his testimony in others. A willful falsehood should always be considered seriously by the jury.

Objection to these comments is raised for the first time on appeal, appellant arguing that the prosecution's remarks misrepresented a mandatory instruction given by the court and amounted to an improper comment on the failure of appellant to testify.

Pursuant to Criminal Rule 30(b)(1), the court instructed the jury that "[a] witness wilfully false in one part of his testimony may be distrusted in other parts." The state concedes that this instruction only concerned statements made by witnesses during the trial and that the reference to it in closing argument was therefore improper. However, the state argues that this impropriety does not amount to reversible plain error. We agree. The misleading reference did not effect substantial rights of appellant [28] and could have been corrected by an appropriate objection.[29]

A more serious contention is that by calling the jury's attention to the hearsay statements attributed to appellant, the jury was made aware of appellant's decision not to take the stand. Appellant's argument derives from reasoning that only he could have explained or contradicted the inconsistent hearsay statements, that the jury would realize this, and that the prosecution was thus commenting on appellant's failure to testify.

An accused's privilege against self-incrimination is violated where comment is made at trial concerning his failure to testify on his own behalf.[30] In McCracken v. State, 431 P.2d 513 (Alaska

---

26. *Compare* McIntyre v. State, 379 P.2d 615, 617 (Alaska 1963):
 Defendant was accused in the indictment of having killed his wife by beating her about the head and body. Whether or not she had been so beaten was a fact in issue in the case. There was testimony that a large area of the deceased's body was covered by black and blue marks, and that her face was badly discolored and swollen. The photographs clearly portray the condition of the body and face as described in the testimony, and thus were relevant with repect to the issue of whether deceased had been beaten as alleged in the indictment.

27. The appellant also alleges prejudice because the photographs were introduced prior to the testimony of Dr. Rogers. No objection to the order of proof was made by the defense in this regard; nor do we consider the specter of plain error to have been raised.

28. Alaska R.Crim. 47(b) provides that "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court."

29. We have previously held that an objection to improper prosecutorial comments is normally a prerequisite to appellate review. McCracken v. State, 439 P.2d 448, 450–451 (Alaska 1968); Rank v. State, 373 P.2d 734, 737 (Alaska 1962).

30. Griffin v. State of California, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965). *See also* Alaska R.Crim.P. 26 (b)(4).

1967), we adopted the following test of whether prosecutorial remarks amount to such a prohibited comment:

[T]he test is whether the language used was manifestly intended or was of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify. (Footnote omitted.) [31]

Applying this test, we conclude that the challenged statements were neither calculated to be, nor of necessity interpreted by the jury as, a comment on appellant's failure to testify. Closing argument was made against the tacitly known background that appellant had not taken the stand; but this circumstance could not prohibit the state from commenting on evidence which appellant might have cast doubt on had he testified. The prosecution did not directly refer to appellant's silence at trial, nor did it note that the evidence of hearsay statements attributed to appellant was uncontradicted.[32] Rather, the state's attorney merely reviewed the hearsay statements and indicated their inconsistency and lack of trustworthiness. In doing so he committed no error.

## SENTENCING COMMENTS

Appellant does not directly contend that the sentence imposed of ten years imprisonment with five years suspended was excessive. Rather, he asserts that an improper comment by the prosecutor resulted in a denial of a fair sentence proceeding.

In an apparent reference to a notation in the presentence report that two previous wives of appellant had died from "unknown causes," the prosecutor stated during the sentencing hearing:

We do know that unfortunately this man had a—an experience of having two other wives die prior to this wife for no apparent reason that—at least that he could explain to the probation officer.

Following an objection to these remarks by defense counsel, Mr. Robert Spinde, the probation-parole officer who authored the report, stated:

I did indicate in my report that Mr. Armstrong's wives number 2 and number 3 I think, did die from unknown causes, I didn't mean to imply anything sinister in this. I simply meant that I didn't know what the causes of death were and that I meant to indicate that he had been widowed twice, I didn't mean to imply anything sinister in that at all.

The court then indicated it was "not gonna consider it as part of any sentence . . . . ."

Despite the court's statement of nonreliance, appellant asserts that a "wild and vague conjecture" was introduced into the proceeding, necessitating resentencing. Appellant argues that error must be found since it is impossible to determine on appeal whether the judge was in fact influenced by the prosecutor's statement.

In Egelak v. State, 438 P.2d 712 (Alaska 1968), the prosecutor had similarly referred during the sentencing hearing to alleged prior unpunished offenses. We stated:

While the district attorney's participation in the sentencing procedures would hardly qualify as model advocacy, we think that our trial judges possess the requisite degree of perceptiveness to recognize and discount any attempt at overreaching, exaggeration, or unfair tactics on the part of counsel. Judges are expected to be at home in frequent extremes of adversary presentation and not to be unduly susceptible to strident pleas for the imposition of harsh sanctions. To a large extent we must rely upon the intelligence, experience, integrity, and discretion of our trial judges in sentencing matters.[33]

31. 431 P.2d at 517, quoting from Knowles v. United States, 224 F.2d 168, 170 (10th Cir. 1955).

32. For cases dealing with propriety of statements that the prosecution evidence is uncontradicted see Annot., 14 A.L.R.3d 723 (1967).

33. 438 P.2d at 716. *See also* Faulkner v. State, 445 P.2d 815, 820 (Alaska 1968).

In this case the trial judge expressly disclaimed any reliance in imposing sentence on the prosecutor's improper comments. We cannot conclude that the sentencing proceeding was infected with prejudice.

The judgment of conviction and the sentence imposed are affirmed.

BONEY, Chief Justice, with whom CONNOR, Justice, joins, dissenting:

We cannot agree with the majority that Armstrong's motion for judgment of acquittal was properly denied.

We do agree that the proper standard to be applied is the one announced in Bush v. State:

> On a motion for a judgment of acquittal the judge must take the view of the evidence and the inferences therefrom most favorable to the state. If he determines that fair minded men in the exercise of reasonable judgment could differ on the question of whether guilt has been established beyond a reasonable doubt, then he must submit the case to the jury.[1]

The controversy here does not concern the primary cause of death. The parties agree that Corrine Armstrong died from asphyxiation resulting from a dense and viscous mucous clot blocking her wind passage.[2] The expert testimony revealed that, while in a normal individual the clot would ordinarily have been expectorated by a cough reflex, the deceased's coughing reflex was inhibited by her deep unconsciousness. What was controverted was whether excessive alcohol consumption or blows to the head caused the deceased's unconsciousness.

The majority concedes, and we agree, that expert testimony was necessary here for the state to establish its case. The majority further concedes that Dr. Rogers could not isolate which factor was the cause of the victim's death and that he believed the reflex-inhibiting state of unconsciousness could have resulted solely from the extremely high blood-alcohol level. Dr. Rogers, in short, was unable to state with even a modicum of certainty whether either the alcohol or the blows caused the deceased's unconsciousness.[3] Armstrong could be found guilty only if the jury could find beyond a reasonable doubt that

---

1. 397 P.2d 616, 618 (Alaska 1964).

2. In regard to this primary cause of death, it is worth noting that the state failed to anticipate accurately its own expert's testimony concerning the ultimate cause of death. As a result, the state was placed in the awkward position of having to modify its theory midway in the presentation of its evidence. In his opening statement, the state's attorney indicated his intent to prove that asphyxiation resulted from a blood clot caused by lacerations of the oral cavity opened by a beating. Unexpectedly, the state, as the prosecuting attorney admitted in closing argument, was forced to abandon that theory when its expert indicated that the clot was composed of mucous formed independently of the lacerations.

3. Dr. Rogers testified:
 Q. Even knowing her complete background, in a medical sense, if it's impossible to say whether one or the other

is responsible, it's entirely possible that —that the blows had nothing to do with her passing out, is that correct or not?
A. She could have been unconscious from the alcohol alone. She could have been unconscious from the blows alone.

. . . . .

Q. Did the mucous plug—or would a mucus plug ever result—normally result then from—directly from—from blows such as this woman struck in the absence of other factors?
A. Well the mucous plug was not the result—not the result of the blows or the alcohol it's—the mucous plug is a normal phenomenon and the important thing was that she did not cough it up and the reason she didn't cough it out is because she was unconscious.
Q. And the reason that she was unconscious from alcohol would—would ha—might have the same effect?
A. Unconsciousness for any reason.

the blows, his criminal agency,[4] caused the unconsciousness.[5]

We regard the logic of the majority opinion as untenable. In effect it holds, that, although expert testimony is required in cases of this type, the jury may find *beyond a reasonable doubt* that the blows caused the death, even though the expert is unable to reach such a conclusion.

Further, we do not disagree with the majority's statement that the fact that a victim died from the "combined effects" of a pre-existing condition and a blow maliciously inflicted by a defendant does not relieve the defendant of liability. Nor do we take issue with the court's acknowledgement of the following legal principle:

> [I]t is well settled that the consequences of an act which is the efficient cause of the death of another are not excused, nor is the criminal responsibility for causing death lessened, by the pre-existing physical condition of the person killed, at the time the act was done, or by his low vitality, which rendered him unable to withstand the shock of the wound inflicted, and without which preexisting condition the blow would not have been fatal, if a causal connection between the blow and the fact of death is made to appear. Accordingly, the fact that the victim died from the combined effects of the wound maliciously inflicted by the defendant and a disease not

connected with the wound does not relieve the defendant of liability.[6]

These rules of criminal law are simply inapposite. We do, however, strongly disagree with the majority's apparent belief that Dr. Rogers' testimony clearly demonstrates that the blows were the "efficient cause" of Mrs. Armstrong's death; that the "combined effects" of the alcohol consumption and blows caused the victim's death; or that "a causal connection between the blow[s] and the fact of death" exists. On the contrary, we think the expert testimony of the state was ambiguous and that Dr. Rogers failed to state with certainty which factor caused the deep unconsciousness.

We believe also that the majority has overlooked some of the subtleties of the Bush v. State test.[7] The situation here is analogous to Jennings v. State [8] where we held that the evidence was such

> as to permit a reasonable inference that [the victim's] fatal injuries were caused by events or circumstances other than a beating inflicted by [the defendant], a reasonable doubt as to [the defendants'] guilt would in fact exist. Fair minded men could not then reasonably have differed on the question of whether there existed a reasonable doubt of [the defendants'] guilt, and therefore a judgment of acquittal would have been required.[9]

---

4. No doubt Armstrong could have been found guilty of assault and battery under AS 11.15.230. Perhaps had the state been fully apprised of the nature of the mucous clot, *see* note 2 *supra*, the state might have charged Armstrong with assault and battery.

5. At various points in his testimony the state's expert indicated that the deceased had consumed alcohol at or near lethal levels, and that alcohol consumption alone may have caused the unconsciousness which led to the death. Regarding the quantity of alcohol consumed, his testimony on direct examination indicated that:

> [H]er blood alcohol level was extremely high. The blood alcohol level was 344 milligrams percent and the urine

was even higher, 432. Now 344 milligrams percent in the blood would render most casual drinkers at least unconscious, without any doubt. In fact a few small people perhaps might even die at that level although that would be sort of touch and go but most people would be unconscious . . . .

*See* R. Donigan, Chemical Tests and the Law 24 (2d ed. 1966).

6. 1 Anderson, Wharton's Criminal Law and Procedure § 197, at 446 (1957).

7. Text accompanying note 1 *supra.*

8. 404 P.2d 652 (Alaska 1965).

9. *Id.* at 654. In reaching this conclusion, the court applied the language of Bush v. State, 397 P.2d 616, 618 (Alaska 1964), and correctly indicated that such

Here there were two alternative theories of the cause of death: the state advocating one, the defense the other. Even the expert witnesses were unable to select one theory over the other. In such circumstances, fair minded men could not reasonably have differed on the question of whether there existed a reasonable doubt of Armstrong's guilt. The evidence clearly demonstrates the existence of such a doubt. Therefore it was error to deny the motion for judgment of acquittal.[10]

We conclude that the judgment should be reversed.

evidence would be insufficient under that test as well as the now disapproved test enunciated in Davis v. State, 369 P.2d 879, 882 (Alaska 1962). For cases indicating our disapproval of the *Davis* test, see Tarnef v. State, 492 P.2d 109

(Alaska 1971); Jordan v. State, 481 P.2d 383 (Alaska 1971); Allen v. State, 420 P.2d 465 (Alaska 1965).

10. Since we regard this issue as controlling, we see no reason to discuss the other matters raised by Armstrong.