712 S.E.2d 99 (2011)
In the Interest of Q.S., a child.
No. A11A0037.
Court of Appeals of Georgia.
June 16, 2011.
*100 H. Brannen Bargeron, for appellant.
S. Hayward Altman, Dist. Atty., Mary Kathryn McKinnon, Asst. Dist. Atty., for appellee.
BLACKWELL, Judge.
Q.S. participated in a vicious assault upon a classmate, and the juvenile court adjudicated her delinquent and ordered her into restrictive custody for 12 months. The adjudication of delinquency is based on findings that Q.S. committed acts that, if committed by an adult, would amount to aggravated battery,[1] aggravated assault,[2] and unlawful disruption of a public school.[3] Q.S. appeals, contending that the evidence is insufficient to sustain the findings of delinquency and that the juvenile court erred when it ordered restrictive custody.[4] We agree with Q.S. that the evidence is insufficient to sustain the findings of aggravated battery and unlawful disruption of a public school, and we reverse the adjudication of delinquency to the extent it is based on these findings. We think the evidence is sufficient, however, to sustain the finding of aggravated assault, so we affirm the adjudication of delinquency to the extent *101 it is based on aggravated assault. Finally, we conclude that the juvenile court abused its discretion when it ordered restrictive custody based on a finding of fact that the evidence cannot sustain, and for this reason, we vacate the order of restrictive custody and remand for the juvenile court to consider again whether restrictive custody is warranted.
Viewed in the light most favorable to the adjudication below,[5] the record shows that Q.S., then 15 years of age, and two other girls attacked and severely beat a classmate at Washington County High School. During the course of the altercation, Q.S. grabbed the victim by her hair, pulled her to the ground, and slammed the head of the victim against the floor. After the victim was on the ground, her three assailants kicked her, struck her with their fists, and pulled her hair. The assault ended when teachers and other students intervened, pulling Q.S. and the other two girls away from the victim.[6]
Following the assault, the victim had a bloody lip and nose, she complained of a headache and dizziness, and she required assistance to stand and walk. Her face later began to swell, and knots appeared on her head, as well as a number of bruises. The victim was taken by her mother to a local hospital, where she underwent a computed tomography (CT) scan. The results of this scan prompted physicians to order magnetic resonance imaging (MRI) of her brain, and this imaging revealed a preexisting brain tumor,[7] located in the area where spinal fluid flows between the brain and spinal column. Her physicians then sent her to the Medical College of Georgia, where surgeons removed the tumor. The victim suffered complications following the initial surgery, which led to several additional surgical procedures to treat these complications.[8] Since these surgeries, the victim has suffered from significant short-term memory loss and other impairments of her cognitive abilities.
At the hearing below, the State attempted to prove that the assault had somehow affected the preexisting tumor and rendered immediate surgery necessary and that the assault, therefore, was a cause of the resulting memory loss and cognitive impairment. The neurosurgeon who testified, however, said that it was impossible to know what effect, if any, the assault had on this tumor. Although the surgeon admitted it was possible that the assault had a "direct effect" on the tumor, he said it was just as likely that the assault had no effect at all. Moreover, there is no evidence that an immediate surgery was necessitated by the assault. In fact, the surgeon said that surgical removal of the tumor was inevitable because, considering the location of the tumor, the victim would not have lived a long lifeperhaps only five more yearswithout surgical removal.[9] The surgeon opined that it was fortuitous for the victim that the tumor was discovered when it was, inasmuch as the discovery of the tumor allowed its removal before the victim was afflicted with more serious symptoms.
Based on this record, the juvenile court found that Q.S. had committed acts that, if committed by an adult, would amount to aggravated battery, aggravated assault, and unlawful disruption of a public school, and the court adjudicated Q.S. delinquent. The court then considered the factors set forth in OCGA § 15-11-63(c) and concluded that restrictive *102 custody is warranted, ordering Q.S. into restrictive custody for 12 months. Q.S. now appeals from the adjudication of delinquency and her placement in restrictive custody.
1. We first consider the sufficiency of the evidence of delinquency. To establish delinquency based on acts of a criminal nature, the State must prove the commission of these acts beyond a reasonable doubt, just as it would in a criminal prosecution of an adult for the same acts. See In the Interest of A.A., 293 Ga.App. 827, 828, 668 S.E.2d 323 (2008). So, when a juvenile challenges the sufficiency of the evidence, we apply the standard set forth in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), and we consider whether the evidence adduced at the hearing would permit a rational trier of fact to conclude beyond a reasonable doubt that the juvenile committed the acts with which she is charged. See In the Interest of A.A., 293 Ga.App. at 828, 668 S.E.2d 323; see also In the Interest of J.C., 308 Ga.App. at 337, 708 S.E.2d 1. In considering the sufficiency of the evidence, we construe the evidence in the light most favorable to the adjudication below, keeping in mind that it is for the trier of fact, not this Court, to weigh this evidence, resolve any conflicts in the evidence, and assess the credibility of witnesses. See In the Interest of A.A., 293 Ga.App. at 828, 668 S.E.2d 323; see also Ferguson v. State, 307 Ga.App. 232, 233(1), 704 S.E.2d 470 (2010).
(a) Aggravated Battery. One commits aggravated battery under Georgia law when she maliciously causes another to suffer bodily harm involving, among other things, a deprivation of a member of the body. OCGA § 16-5-24(a). In this case, the State asserts, and the juvenile court found, that Q.S. deprived the victim of her brain, inasmuch as the victim suffered from short-term memory loss and impairment of her cognitive abilities after the assault. See Miller v. State, 275 Ga. 730, 732(1), 571 S.E.2d 788 (2002) ("When the evidence shows that a battered victim has suffered a severe injury to their brain, resulting in the loss of normal brain functioning, they are said to have been `deprived of their brain,' thus suffering an aggravated battery."); Scott v. State, 243 Ga.App. 383, 384-385(1)(b), 532 S.E.2d 141 (2000) (evidence that blows to head of victim caused memory lapses and permanent nerve damage is sufficient to sustain aggravated battery conviction). We agree that the evidence supports a finding that the victim suffered a loss of normal brain function following the assault, but we conclude that the evidence does not prove beyond a reasonable doubt that this loss of normal brain function was proximately caused by the assault that Q.S. and her accomplices committed.
For purposes of aggravated battery, one causes another to suffer an injury when her conduct is a "proximate cause" of the injury, or, put another way, a cause that, "in a natural and continuous sequence, unbroken by any efficient intervening cause, produces [the] injury, and without which the [injury] would not have occurred." State v. Jackson, 287 Ga. 646, 648(2), 697 S.E.2d 757 (2010) (citation and punctuation omitted). "In a criminal case, proximate cause exists when the accused's act or omission played a substantial part in bringing about or actually causing the victim's injury . . . and the injury. . . was either a direct result or a reasonably probable consequence of the act or omission." Chaney v. State, 281 Ga. 481, 482(1), 640 S.E.2d 37 (2007) (citation and punctuation omitted). So, to prove aggravated battery in this case, the State was required to prove beyond a reasonable doubt that the assault committed by Q.S. and her accomplices "played a substantial part in bringing about" the loss of normal brain function for the victim and that the loss of normal brain function "was either a direct result or a reasonably probable consequence" of the assault.
The State does not appear to dispute that the victim suffered from short-term memory loss and cognitive impairment only after the surgeries to remove her tumor and treat complications of the removal of the tumor,[10] *103 but the State contends that the assault affected the tumor and rendered these surgeries necessary. The evidence, however, simply does not support this contention. The only witness to testify about the effect of the assault upon the tumor was the neurosurgeon, and he said that it was as likely as not that the assault had no effect at all upon the tumor. The neurosurgeon also pointed out that the surgical removal of the tumor was inevitable and that, without it, the victim would not have lived a long life. And the neurosurgeon added that the sooner the surgery was performed, the better for the victim. The State points to evidence that the victim complained of a headache and dizziness soon after the assault and before any surgeries as evidence that the assault affected the tumor, but there was no testimony that dizziness is a symptom of such a tumor, and as to the headache, the neurosurgeon said that the appearance of this symptom suggested a possibility that the assault affected the tumor, "but it's also equally possible" that it did not. No rational trier of fact could conclude beyond a reasonable doubt from this evidence that Q.S. and her accomplices caused the short-term memory loss and cognitive impairment that the victim has suffered, and for this reason, it does not sustain the finding of aggravated battery. See Doomes v. State, 261 Ga.App. 442, 442(1), 583 S.E.2d 151 (2003) (no evidence that gunshot to arm caused victim to lose use of his legs); see also Kilgore v. State, 95 Ga.App. 462, 465-467(3), 98 S.E.2d 72 (1957) (insufficient evidence that blow to head, as opposed to brain tumor, caused death of victim). We, therefore, reverse the adjudication of delinquency to the extent it is premised on a finding of aggravated battery.
(b) Aggravated Assault. One commits aggravated assault under Georgia law when he assaults another with, among other things, a deadly weapon. OCGA § 16-5-21(a)(2). Although hands and feet are not deadly weapons per se, they "can become such instruments when used to strike another." In the Interest of T.W., 280 Ga.App. 693, 694, 634 S.E.2d 854 (2006). Whether hands or feet constitute a deadly weapon in a particular case is a question for the trier of fact, considering all the relevant circumstances, including the way in which the hands or feet were used and the injuries actually suffered by the victim. See Jones v. State, 294 Ga.App. 564, 566(1), 669 S.E.2d 505 (2008); Richards v. State, 222 Ga.App. 853, 854(1), 476 S.E.2d 598 (1996).
We think the evidence in this case is sufficient to permit a rational trier of fact to conclude beyond a reasonable doubt that Q.S. and her accomplices committed an aggravated assault upon the victim. The evidence shows that Q.S., using her hands, grabbed the victim by the hair, pulled her to the ground, and slammed the head of the victim upon the ground. All three assailants then used their feet to kick the victim as she lay curled upon the floor. And as a result of the assault, the lip and nose of the victim were bloodied, her face was bruised and began to swell, she was missing hair that had been pulled from her scalp, she was unable to stand or walk without assistance, and she complained of a headache and dizziness. These injuries were serious enough to prompt her mother to take her to a hospital and serious enough for medical personnel to order a CT scan. The evidence is sufficient to sustain the finding of aggravated assault. See Jones, 294 Ga.App. at 566(1), 669 S.E.2d 505 (evidence that defendant beat victim with *104 hands, causing facial swelling, blood on the face, and a fractured facial bone, is sufficient to sustain aggravated assault conviction); Scott v. State, 243 Ga.App. 383, 385(1)(d), 532 S.E.2d 141 (2000) (evidence that defendant beat victim about head and face with hands is sufficient to sustain aggravated assault conviction); Richards, 222 Ga.App. at 854(1), 476 S.E.2d 598 (evidence that defendant choked victim with hands, until the victim lost consciousness, "was unquestionably sufficient" to sustain aggravated assault conviction). Consequently, we affirm the adjudication of delinquency to the extent it is based on a finding of aggravated assault.
(c) Unlawful Disruption of Public School. At the time of the assault in this case, it was "unlawful for any person to disrupt or interfere with the operation of any public school."[11] OCGA § 20-2-1181(2008). Q.S. contends that the evidence does not sustain the finding that she unlawfully disrupted a public school because, although the evidence shows that the assault occurred on the premises of Washington County High School, there was no evidence that Washington County High School is a "public school." We agree.
Proof that the school disrupted is, in fact, a public school is an essential element of proving a violation of OCGA § 20-2-1181, and like every other essential element, it must be proven beyond a reasonable doubt. See In the Interest of J.B., 289 Ga.App. 617, 618, 658 S.E.2d 194 (2008). The State concedes that there is no direct evidence here that Washington County High School is a public school. The State argues, however, that a rational trier of fact could infer that it is a public school from the fact that "Washington County" appears in the name of the school. That the name of a county or municipality appears within the name of a school might suggest that the school is operated by the county or municipality, but we do not think it proves beyond a reasonable doubt that the school is a public one.[12] And although the juvenile court might have taken judicial notice that Washington County High School is a public school, it could not without first announcing its intent to do so and affording the parties an opportunity to be heard on the question, which the court below did not do. In the Interest of J.A.L., 284 Ga.App. 220, 220(1), 644 S.E.2d 162 (2007). We, therefore, must reverse the adjudication of delinquency to the extent it is premised upon a finding of unlawful disruption of a public school.
2. We now turn to the contention that the juvenile court abused its discretion when it determined that restrictive custody is warranted. When a child is found to have committed a designated felony act, such as aggravated assault, the juvenile court is authorized to order restrictive custody under OCGA § 15-11-63.[13] A finding that restrictive custody is warranted must be supported by a preponderance of the evidence. OCGA § 15-11-63(b). And to determine whether restrictive custody is warranted, the juvenile court must consider and make written findings about these factors: (1) the needs and best interest of the child; (2) the record and *105 background of the child; (3) the nature and circumstances of the offense, including whether any injury sustained by the victim was actually inflicted by the child or another; (4) the need to protect the community; and (5) the age and physical condition of the victim. OCGA § 15-11-63(c). The weight to be accorded each factor, and the ultimate decision about whether restrictive custody is warranted, is committed to the sound discretion of the juvenile court. See In the Interest of I.C., 300 Ga.App. 683, 686(2)(a), 686 S.E.2d 279 (2009); In the Interest of L.J., 279 Ga.App. 237, 240, 630 S.E.2d 771 (2006).
With respect to the third factor, the juvenile court noted the vicious nature of the assault and the serious injuries that the victim sustained and, based on these things, concluded that the third factor weighs heavily in favor of restrictive custody. We agree that the evidence shows an especially vicious assault and that the victim sustained serious injuries as a result. But the juvenile court seemed to focus most on one particular injury, the short-term memory loss that the victim has suffered since her surgeries. As we discuss in Division 1(a), however, the evidence does not support a finding that this particular injury was proximately caused by the assault, rather than by the surgical removal of the preexisting brain tumor or the complications and additional surgeries that followed.[14] Because it appears that the juvenile court relied substantially on a finding of fact that is not sustained by the evidence in its analysis of the third factor, we must conclude that the trial court abused its discretion. See State v. Pickett, 288 Ga. 674, 679(2)(d), 706 S.E.2d 561 (2011) (an abuse of discretion occurs where "the trial court significantly misapplies the law or clearly errs in a material factual finding"). And as a result, we must vacate the order of restrictive custody and remand for the juvenile court "to exercise its discretion again, using properly-supported factual findings," inasmuch as the evidence here would sustain, but does not demand absolutely, a finding that restrictive custody is warranted. Id. at 680(2)(d), 706 S.E.2d 561 (where a discretionary ruling of a trial court is premised on unsupported factual findings or a misapplication of the law, an appellate court cannot affirm that holding unless it concludes that, if the trial court had correctly found the facts and correctly applied the law, it would have had no discretion to reach a different judgment.)
Judgment affirmed in part, reversed in part, and vacated in part, and case remanded.
BARNES, P.J., and ADAMS, J., concur.
NOTES
[1] OCGA § 16-5-24(a).
[2] OCGA § 16-5-21(a)(2).
[3] OCGA § 20-2-1181.
[4] Q.S. also contends that the statute prohibiting the disruption of a public school, OCGA § 20-2-1181, is unconstitutional. For other reasons, we reverse the adjudication below to the extent it is based on a violation of this statute, see Division 1(c), post, so we need not reach the constitutional issue.
[5] See In the Interest of J.C., 308 Ga.App. 336, 337, 708 S.E.2d 1 (2011).
[6] Both Q.S. and the other two girls later admitted that they had participated in the assault. The principal of their school testified that, when he spoke with Q.S. immediately after the assault, Q.S. admitted punching the victim, ostensibly because the victim "got in her face." And Q.S. gave two written statements about the assault, admitting in each that she hit the victim.
[7] A physician estimated that this tumor had been growing for as long as ten years before the assault.
[8] More specifically, the victim developed hydrocephalus, a condition that involves an excessive accumulation of spinal fluid in the brain. The additional surgical procedures required by this condition involved the placement of shunts to drain excess spinal fluid.
[9] The surgeon explained that, without surgery, the tumor eventually would have obstructed the flow of spinal fluid, which would have caused the victim to lapse into a coma and eventually die.
[10] Notably, the State never asked the neurosurgeon whether the short-term memory loss and cognitive impairment were a result of the assault, the tumor, the surgery to remove the tumor, the hydrocephalus, or the later surgeries to treat the hydrocephalus. The evidence is undisputed, however, that the victim did not show these symptoms until after the surgical procedures. Her principal testified that, immediately after the assault, the victim was able to recall the events leading up to the assault, and in fact, the victim began to prepare a written statement about the assault, although she stopped before completing it because she had a headache. When she was treated at the local hospital and at the Medical College of Georgia before her initial surgery, the victim appeared alert and responsive. And her mother testified that, immediately after the assault, the victim was able to recall the details of the assault and that her memory problems did not appear until after she underwent surgery. Although the State argued below, and the juvenile court apparently found, that the mother said the victim experienced memory loss in the hospital emergency room, we have carefully searched the record and can find no such testimony in it, and it appears that the State no longer disputes that the memory loss and cognitive impairment appeared only after the surgeries.
[11] The statute was amended in 2010 to prohibit only "knowingly, intentionally, or recklessly" disrupting or interfering with the operation of a public school. The old version of the statute, however, applies to conduct occurring before May 27, 2010, including the incident at issue here. See Ga. L. 2010, p. 518, § 4.
[12] We note that, according to its website, the Georgia Independent School Association includes many nonpublic schools with names that incorporate the name of a county or municipality, including Athens Academy, Atlanta Girls' School, Atlanta International School, Atlanta Speech School, Augusta Preparatory Day School, Bulloch Academy, Chatham Academy, Crisp Academy, LaGrange Academy, Savannah Country Day School, Terrell Academy, and Twiggs Academy. Georgia Independent School Association, Member Schools (http://www.gisa-schools. org/) (visited May 27, 2011).
[13] When a juvenile court orders restrictive custody, the child must be placed in the custody of the Department of Juvenile Justice for an initial period of five years, must be confined in a youth development center for a time certain, initially not less than 12 months and not more than 60 months, and must be placed under intensive supervision for 12 months thereafter. See OCGA § 15-11-63(e). The order of restrictive custody in this case, which included the placement of Q.S. in a youth development center for 12 months, is consistent with these statutory requirements.
[14] We recognize that, for the purpose of the restrictive custody analysis, the trier of fact is only required to find facts by a preponderance of the evidence. OCGA § 15-11-63(b). Under the preponderance standard, to sustain a finding that the assault caused the victim to suffer memory loss, the evidence, viewed in the light most favorable to the findings of the court below, must show that the assault more likely than not played a substantial part in bringing about the memory loss. See Bourjaily v. United States, 483 U.S. 171, 176, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987); State v. Rocco, 255 Ga.App. 565, 566, 566 S.E.2d 365 (2002). Here, however, the only evidence regarding the cause of the memory loss is the testimony of the neurosurgeon, who said it was only as likely as not that the assault somehow affected the brain tumor, thereby necessitating immediate brain surgery. The finding that the assault caused the victim to suffer memory loss, therefore, cannot be sustained. We note, however, that the evidence would support a finding that the assault caused the victim to sustain numerous other serious injuries.