**FOURTH DIVISION**
**DILLARD, P. J.,**
**RICKMAN, P. J., and BROWN, J.**

**NOTICE: Motions for reconsideration must be
*physically received* in our clerk's office within ten
days of the date of decision to be deemed timely filed.
https://www.gaappeals.us/rules**

*DEADLINES ARE NO LONGER TOLLED IN THIS
COURT. ALL FILINGS MUST BE SUBMITTED WITHIN
THE TIMES SET BY OUR COURT RULES.*

**February 5, 2021**

# In the Court of Appeals of Georgia

A20A1662. TYSON v. THE STATE

BROWN, Judge.

Following a jury trial, Eugene Donald Tyson was convicted of aggravated assault. Tyson now appeals from the denial of his motion for a new trial, arguing that the evidence was insufficient to sustain his conviction and that he was prejudiced by the State's failure to procure potentially exculpatory evidence. He further contends that the trial court erred in allowing the prosecutor to make improper and prejudicial statements during closing argument. For reasons explained more fully below, we find no error and affirm.

"On appeal from a criminal conviction, the defendant is no longer entitled to a presumption of innocence and we therefore construe the evidence in the light most favorable to the jury's guilty verdict." (Citation and punctuation omitted.) *Maddox*

*v. State*, 346 Ga. App. 674, 675 (816 SE2d 796) (2018). So viewed, the record shows that a police officer responded to a 911 call about a potential assault at a local storage facility. When she arrived at the scene, the officer found the victim, who was approximately seven months pregnant, with visible injuries to her face and neck. The victim's injuries were significant enough that the officer called an ambulance and, after examining the victim at the scene, EMTs transported her to the hospital for treatment.

When interviewed by the officer, the victim identified Tyson as her assailant and explained that Tyson was both her boyfriend and the father of her unborn child. The victim also reported that she and Tyson began fighting when, after picking up the victim's prescribed pain medication from the pharmacy, she refused to share the pills with Tyson. As the couple was driving, they approached the storage facility, and Tyson pushed the victim out of his truck and threw the victim's belongings after her. Tyson then exited the truck, chased the victim with a baseball bat, and kicked her in the stomach.

Based on her interview of the victim and two eyewitnesses, the officer obtained a warrant for Tyson's arrest, and Tyson was subsequently indicted on two counts of

aggravated assault.[1] At trial, in addition to the testimony of the responding officer, the State also presented the testimony of the victim and two eyewitnesses to the incident. During her testimony, the victim identified Tyson as her assailant, but stated that because of her drug use, she did not remember very much about the assault, which had occurred five years earlier.[2] The victim testified, however, that her memory of the incident would have been clear on the day the assault happened, and she indicated that she had no reason to doubt any of the facts she related to the responding officer. Moreover, the victim could recall that she was pregnant at the time and that her obstetrician had prescribed hydrocodone for the victim's back pain. The victim also remembered that she and Tyson were fighting, both physically and verbally, as Tyson drove them on the day in question. She described the physical fighting as "violent," and she remembered that she was seen at a hospital.

The first eyewitness worked as an office assistant at the storage facility. On the day in question, she noticed a truck driven by Tyson pull into the facility's parking

---

[1] Count One of the indictment charged Tyson with aggravated assault by using his hands and feet as deadly weapons to intentionally push, strike, and kick the victim in an attempt to commit a violent injury. Count Two charged Tyson with aggravated assault by brandishing a baseball bat at the victim.

[2] According to the victim, at the time of the assault, both Tyson and she were taking methamphetamine and "pills."

lot going "kind of fast," and then brake abruptly. She watched as a visibly pregnant woman exited the truck, and it looked to her as though the woman had been pushed from the vehicle. Tyson and the woman appeared to be fighting and, after the woman fell to the ground, the man "was just kind of beating," "throwing punches at," and kicking her. When Tyson left the victim to get back in the truck, the woman also attempted to return to the vehicle. Before she could do so, however, Tyson drove out of the parking lot and then turned back into the lot, with the woman hanging onto the truck's door the entire time. After the truck re-entered the parking lot, Tyson exited the vehicle, resumed hitting the woman, and kicked her in the stomach. The eyewitness also saw Tyson hit the woman with a baseball bat. She speculated that the attack on the woman lasted for a few minutes and during that time, Tyson was "just beating the tar out of" the victim. According to the eyewitness, she remembered the incident well, because "it was the worst thing" she had ever seen, and during the attack she wondered whether the victim "[was] going to die."

During the early part of the assault, the first eyewitness called 911, and after the attack ended, she took the victim into her office to wait for the police. At that time, the eyewitness observed that the victim had injuries to her face and she also saw

4

blood coming down the victim's legs that appeared to be coming from "between her legs."

The second eyewitness corroborated many of the facts testified to by the police officer and the first eyewitness. He stated that on the day in question, he was walking in front of the storage facility when the truck in which Tyson and the victim were riding drove past him. He saw that Tyson was "throwing blows" at the victim's head and he also saw one of the truck's doors open and the victim leave the truck. Once the victim was out of the truck, Tyson followed her and at one point kicked her in the stomach before returning to his truck and leaving the scene. The second eyewitness observed that the woman was visibly pregnant and was crying and holding her stomach after the incident was over.

Based on the foregoing evidence, the jury found Tyson guilty of committing aggravated assault with his hands and feet (Count One), but acquitted him of committing aggravated assault with a baseball bat (Count Two). The trial court entered judgment on the jury's verdict, and Tyson filed a timely motion for a new trial, asserting that the evidence was insufficient to support his conviction and that he was entitled to a new trial "[f]or such other grounds as are added due to amendment of this motion." A hearing on the motion for a new trial was scheduled

for late January 2019, but was continued twice pending the appointment of appellate counsel for Tyson. After appellate counsel entered an appearance, the hearing was scheduled for July 30, but Tyson's attorney failed to appear. The court rescheduled the hearing for September 3, and on that day, appellate counsel filed a motion for continuance based on a delay in receiving the trial transcript. The court granted the motion and scheduled a status conference for November 6. Following that conference, the trial court entered an order requiring any amended motion for a new trial and brief in support thereof to be filed no later than November 27. The order also set the hearing on the new trial motion for December 4. On the day of the scheduled hearing, however, appellate counsel filed another motion for continuance. The trial court again granted the continuance, and the hearing was rescheduled for January 27, 2020.

On February 10, 2020, the trial court entered an order denying Tyson's motion for a new trial. In that order, the court noted that neither an amended motion nor brief was ever filed and that appellate counsel had failed to appear at the January 27 hearing. Accordingly, the trial court ruled on the only ground set forth in Tyson's new trial motion, that the evidence was insufficient to sustain his conviction.

Four days after the trial court entered its order, Tyson's attorney filed an amended motion for a new trial in which Tyson again asserted that the evidence was

6

insufficient to sustain his conviction and further asserted that the "State failed to procure evidence that could have been potentially exculpatory." Approximately three weeks later, on March 9, Tyson filed his notice of appeal from the trial court's February 10 order, a motion for a reconsideration of that order, and a motion to extend the time for filing a notice of appeal.[3] Tyson's appeal was docketed in this Court on April 6, and on June 24, Tyson filed a motion to remand, which we denied.

1. Tyson contends that the evidence was insufficient to sustain his conviction for aggravated assault (Count One). With respect to this claim of error,

> the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. In determining that question, we consider the inferences that can be logically derived from the evidence presented at trial. As long as there is some competent evidence, even though contradicted, to support each fact necessary to make out the State's case, the jury's verdict will be upheld.

(Citation and punctuation omitted.) *Wade v. State*, 305 Ga. App. 819, 821 (701 SE2d 214) (2010).

---

[3] There is nothing in the appellate record indicating that the trial court ever acted on either of Tyson's motions.

To convict Tyson of aggravated assault, the State was first required to prove that Tyson committed an assault – i.e., that he "[a]ttempt[ed] to commit a violent injury to [the victim] or . . . commit[ted] an act which place[d] [the victim] in reasonable apprehension of immediately receiving a violent injury." OCGA § 16-5-20 (a). And to prove an aggravated assault, the State was required to show that Tyson committed the assault "[w]ith a deadly weapon or with any object, device, or instrument which, when used offensively against a person, is likely to or actually does result in serious bodily injury." OCGA § 16-5-21 (a) (2). Here, Tyson was charged with committing aggravated assault against the victim by using his hands and feet to push, strike, and kick the victim in an attempt to inflict a violent injury on her. Tyson contends that the State failed to prove the aggravated nature of the assault, because it failed to show that his hands and feet constituted deadly weapons. We disagree.

Although hands and feet are not deadly weapons per se, they can become deadly weapons when used to strike another person. *In the Interest of T. W.*, 280 Ga. App. 693, 694 (634 SE2d 854) (2006). Whether hands and feet constituted deadly weapons in a particular case is a question for the jury. *Goodrum v. State*, 335 Ga. App. 831, 832 (1) (783 SE2d 354) (2016). And to prove that hands and feet qualified as deadly weapons, the State may rely on evidence of the circumstances surrounding

8

the assault, including the way in which the hands and feet were used and any injury suffered by the victim. See *Jones v. State*, 294 Ga. App. 564, 566 (1) (669 SE2d 505) (2008). The State, however, is not required to prove that the victim sustained a serious injury. Rather, it need only prove that given the way in which the defendant's hands and feet were used against the victim, she was likely to receive "serious bodily injury." OCGA § 16-5-21 (a) (2). See also *Watson v. State*, 301 Ga. App. 824, 826 (689 SE2d 104) (2009) (to prove aggravated assault "the State was only required to show that [the object used against the victim] was likely to result in serious bodily injury, not that it actually caused such injury").

In this case, the first eyewitness testified that Tyson used his hands and feet to "beat[] the tar out of" the victim, she described the incident as one of the worst things she had ever witnessed, and explained that the attack was so vicious, she wondered if the victim would survive it. Additionally, the victim herself described the argument she had with Tyson that day as involving violent, physical contact, and she reported to police that Tyson pushed her from his truck, chased her, and kicked her in the stomach. Moreover, the evidence showed that Tyson's use of his hands and feet against the victim resulted in the victim sustaining visible injuries to her head and face. The victim also sustained some type of injury that caused her to bleed down

9

both of her legs, and her injuries were severe enough that trained medical personnel determined the victim needed examination and treatment at a hospital. Despite Tyson's arguments to the contrary, we find that this evidence supports the jury's conclusion that Tyson used his hands and feet as deadly weapons in assaulting the victim. See *In the Interest of Q. S.*, 310 Ga. App. 70, 75 (1) (b) (712 SE2d 99) (2011) (defendant's aggravated assault conviction was supported by evidence showing that defendant used her hands to grab the victim's hair, pull her down, and slam the victim's head on the ground, and the defendant thereafter used her feet to kick the victim; as a result, the victim's lips and nose were bloodied, her face was bruised and swollen, she complained of headaches and dizziness, and she received treatment at the hospital for injuries); *Scott v. State*, 243 Ga. App. 383, 385 (1) (d) (532 SE2d 141) (2000) (evidence showing that the defendant "beat the victim about the head and face with his hands is sufficient to authorize the jury's verdict that [the defendant] is guilty, beyond a reasonable doubt, of aggravated assault").

2. Tyson asserts that he was prejudiced by the State's failure "to procure evidence that could have been potentially exculpatory," specifically that surveillance video would have supported Tyson's contention at trial that "the individual in the truck with [the victim] was not him." In support of his assertion that he is entitled to

10

a new trial, Tyson points to the police officer's testimony that she did not know whether a storage facility close to where the incident occurred had surveillance video. An eyewitness who observed the incident testified that she worked in the facility, that it had a surveillance camera with a partial view of the parking lot where the incident occurred, and that the video would have been retained for 30 days. Tyson made a pre-trial demand for exculpatory evidence under *Brady v. Maryland*, 373 U. S. 83 (83 SCt 1194, 10 LE2d 215) (1963).

The sole authority upon which Tyson relies to support his claim on appeal is this Court's opinion in *Albert v. State*, 180 Ga. App. 779, 782-783 (3) (350 SE2d 490) (1986). In *Albert*, we stated:

> In *California v. Trombetta*, 467 U.S. 479 (104 SCt 2528, 81 LE 2d 413) (1984), the United States Supreme Court set down certain standards for determining whether the destruction of physical evidence amounted to a constitutional violation. First, it must be shown that the evidence was not destroyed "in a calculated effort to circumvent the disclosure requirements established by *Brady v. Maryland* and its progeny." . . . Further, "whatever duty the Constitution imposes on the States to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense. To meet this standard of constitutional materiality, evidence must both possess an exculpatory value that was apparent before the evidence was destroyed,

11

and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means."

(Citations and punctuation omitted.) Id.

As the Supreme Court of Georgia recently explained, "[t]his test is ordinarily applied when State officials dispose of potential evidence that was previously in the State's actual or constructive possession." *Goins v. State*, Ga. (3) (850 SE2d 68) (2020). In *Goins*, as in this case, the police officer "did not try to collect or further document certain potential evidence in the first place . . . and no State actor then had anything to do with the disposition of that potential evidence." Id. at (3). The Supreme Court held that even if it assumed "that this claim was timely and property raised in the trial court" and that the *Trombetta* due process test was properly invoked based on the particular facts before it, the appellant had failed to establish a due process violation on the merits. Id. at (3).

In this case, even if we assume that the issue was timely and properly raised in the trial court[4] and that this test should be applied to the circumstances now before us, Tyson

---

[4] As stated previously, Tyson did not assert this argument until after the trial court had already ruled on his motion for new trial.

12

has failed to show that the purportedly destroyed evidence had exculpatory value that was apparent before it was destroyed. . . . [Instead, Tyson] has shown only a bare speculation that the purported evidence might have exonerated him. He has failed to show that the evidence would have played a "significant role" in his defense and has not met the standard for reversal of a conviction based on the destruction of evidence.

(Citation and punctuation omitted.) *Moten v. State*, 252 Ga. App. 222, 225 (5) (a) (554 SE2d 553) (2001). Accordingly, we find no merit in this enumeration of error.

3. Tyson claims that the trial court "erred in not sustaining defense counsel's objection to improper and highly prejudicial statements . . . during closing arguments." In support of this claim, Tyson points to the State's argument that "[t]he fact that he kicked her in the stomach, while she's seven months pregnant – eight months pregnant, there could have been any number of complications arising from that. She could have hemorrhaged, the baby could have died. But luckily. . . ." In his view, his counsel properly objected to this statement because

[t]here is no evidence that those were possible outcomes of the injuries that were actually sustained. There was no evidence provided as to the injuries sustained or the possibility that the injuries could have been worse that what was sustained. . . . Additionally, the State interjected the baby as a victim in this case, even though the baby was not listed as a

13

victim in the indictment, and no evidence was presented as to the baby's injuries, or possible injuries.

The State "is granted wide latitude in conducting closing argument, and defining the bounds of such argument is within the trial court's discretion." (Citation and punctuation omitted.) *Cole v. State*, 261 Ga. App. 809, 810 (2) (584 SE2d 37) (2003) (physical precedent only). "This 'wide latitude' encompasses the prosecutor's ability to argue reasonable inferences raised by the evidence." (Citation and punctuation omitted.) *Ballard v. State*, 268 Ga. App. 55, 61 (5) (d) (601 SE2d 434) (2004). In *Cole*, the State presented evidence in an aggravated assault case showing that the defendant "walked toward the victim and fired two shots at him at close range." 261 Ga. App. at 811 (2). We concluded that the State drew a reasonable inference from the evidence when it argued, "How only by the grace of God we're not here on a murder prosecution, ladies and gentleman." Id. at 810 (2).

In this case, the evidence showed that the victim was visibly pregnant, that Tyson "beat[] the tar out of" the victim and kicked her in the stomach during the violent attack, that blood appeared to come from between her legs after the attack, and that one eyewitness feared the victim was "going to die." Having reviewed this evidence, we cannot say that the prosecutor drew unreasonable inferences from it.

14

"[T]he trial court acted within its discretion in permitting the prosecutor's argument and overruling [Tyson]'s objection." *Galvan v. State*, 330 Ga. App. 589, 595 (3) (a) (768 SE2d 773) (2015).

*Judgment affirmed. Dillard, P. J., and Rickman, P. J., concur*.